**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MANUFACTURED HOME
COMMUNITIES, INC., now known as,
Equity Lifestyle Properties, Inc.,
            *Plaintiff-Appellant,*

            v.

COUNTY OF SAN DIEGO; DIANNE
JACOB,
            *Defendants-Appellees.*

No. 09-55586

D.C. No.
3:03-cv-02342-
J-BLM

MANUFACTURED HOME
COMMUNITIES, INC., now known as,
Equity Lifestyle Properties, Inc.,
            *Plaintiff-Appellant,*

            v.

COUNTY OF SAN DIEGO; DIANNE
JACOB,
            *Defendants-Appellees.*

No. 10-55496

D.C. No.
3:03-cv-02342-
JAH-BLM

OPINION

Appeal from the United States District Court
for the Southern District of California
Napoleon A. Jones, District Judge, Presiding

Argued and Submitted
January 12, 2011—Pasadena, California

Filed August 26, 2011

16471

Before: M. Margaret McKeown, William A. Fletcher, and
Richard R. Clifton, Circuit Judges.

Opinion by Judge William A. Fletcher

## COUNSEL

David J. Bradford, Bradley Yusim, JENNER & BLOCK, Chicago, Illinois, Steven S. Fleischman, ROBIE & MATTHAI, APC, for the plaintiff-appellant.

James Chapin, William A. Johnson, Jr., William L. Pettinghill, OFFICE OF THE COUNTY COUNSEL, San Diego, California, for the defendants-appellees.

## OPINION

W. FLETCHER, Circuit Judge:

Equity Lifestyle Properties, Inc., formerly known as Manufactured Home Communities, Inc. ("MHC"), appeals the district court's decision granting the County of San Diego and County Supervisor Dianne Jacob's (collectively "Defendants") motion to strike MHC's defamation suit under California's anti-SLAPP (Strategic Lawsuit Against Public Participation) statute. *See* Cal. Civ. Proc. Code § 425.16. MHC argues that the district court erred in concluding that MHC failed to make a prima facie case that various statements made by Jacob were false. MHC also appeals the district court's order granting attorney's fees under California's anti-SLAPP statute.

We affirm.

## I. Background

MHC is a real estate investment trust based in Chicago. *Manufactured Home Cmtys., Inc. v. Cnty. of San Diego* (*MHC*), 544 F.3d 959, 961 (9th Cir. 2008). MHC owns and operates mobile home parks throughout the United States. *Id.* MHC has three parks in unincorporated areas of San Diego County, called Lamplighter Village, Rancho Valley, and Rancho Mesa. *Id.* This appeal is based on allegedly defamatory statements made by Supervisor Dianne Jacob in response to two events at the parks.

The first event was MHC's initiation of phased rent increases at all three parks in July 2002. *Id.* These rent increases led tenants to complain to Jacob about MHC.

The second event was a sewage backup at Rancho Valley. The backup occurred at the mobile home of Mike Dmochowski and his family on Thursday, December 5, 2002.

Dmochowski informed MHC of the backup on December 6. MHC hired MBG Construction to clean up the sewage. MBG Construction, in turn, subcontracted to Flood Rescue Service.

On Saturday, December 7, a member of the Rancho Valley homeowners association reported the backup to San Diego County's Hazardous Incident Report Team ("HIRT"). Tony Torres at HIRT contacted Terry Hanifin at MHC. According to a "chronology of events" prepared by Chimene Adams, Jacob's Policy Advisor, Hanifin told Torres that "the situation was under control." According to Llew Munter, an employee of the San Diego Department of Environmental Health ("DEH"), Hanifin told Torres that "the problem had been resolved." Hanifin also told Torres that the carpet at the Dmochowskis' mobile home had been removed and that the home would be cleaned and sanitized by Monday, December 9. Based on Hanifin's assurance that "the situation was under control," or that "the problem had been resolved," HIRT did not send a team to Rancho Valley during the weekend.

After receiving more complaints about the sewage backup, HIRT sent a team to Rancho Valley on Monday, December 9. When the team arrived at six o'clock that evening, it discovered that, although Flood Rescue Service had indeed been working on the problem, the Dmochowskis' home was still unfit for habitation. According to a report by Richard Haas, Deputy Director of DEH, the Dmochowskis were still living in the home despite its condition. The Dmochowskis stated that they wanted to leave but could not afford to do so. Many of the owners complained to the HIRT team about the backup and about MHC's inaction.

Supervisor Jacob criticized MHC in numerous statements both before and after the sewage backup. We describe here the six statements on which MHC bases its appeal.

First, Jacob spoke at a Lamplighter Village tenant meeting on November 16, 2002, three weeks before the sewage

backup. *MHC*, 544 F.3d at 962. Jacob criticized MHC and its decision to increase rents. She said:

> We are working with County Counsel, our new District Attorney Bonnie Dumanis and your [attorneys] to determine whether or not there are civil and/or criminal actions that should be filed against the company.

Second, on November 18, one of Jacob's assistants, with Jacob's approval, sent an email to residents of the three parks. The email included a summary of Jacob's statements at the November 16 meeting at Lamplighter Village. The email included the following statement:

> I have already talked with County Counsel and District Attorney-Elect Bonnie Dumanis and they are very interested in following up to determine whether or not there are civil and/or criminal actions that should be filed against the company.

Third, on December 10, Jacob was interviewed during a television broadcast about the sewage backup at Rancho Valley. Jacob made the following statement:

> This company in this case lied to the County. Said to the County that everything was fine, the sewage situation was fixed. And, in fact, it was not.

Fourth, as part of the same televised interview on December 10, Jacob said:

> [MHC] has a reputation throughout the country of running people out of older mobile home parks, increasing the value of the park, and then selling it at a profit.

Fifth, on December 29, an article in the *San Diego Union-Tribune* quoted Jacob as saying the following about MHC's rent increases:

> It's a deliberate attempt to force these people out of their homes in order for the company to move newer mobile homes in, increase the value of the park and sell it for a profit. . . . They have done this throughout the country, not just here in San Diego County.

Sixth, on January 18, 2003, Jacob spoke at a meeting at Lamplighter Village. According to the talking points she used at the meeting, she said:

> December 6, 2002, MHC deliberately LIED to the County about the sewage back-up in the Dmochoskis [sic] mobilehome. MHC told the County NOT to respond to the sewage back-up in this unit because MHC said that it had everything under control. That was a lie. It was a dangerous lie for the family that lives there and who had to contend with raw sewage in their home. MHC put the health and safety of this family in jeopardy and MHC should be ashamed of itself.

MHC filed suit against San Diego County in federal district court for the Southern District of California on November 24, 2003, alleging a variety of federal-law claims — a violation of the Equal Protection Clause, a violation of the First Amendment, a taking in violation of the Fifth and Fourteenth Amendments, and a violation of substantive due process. In its First Amended Complaint, MHC added Jacob as a defendant, alleging a violation of the First Amendment. *MHC*, 544 F.3d at 962. In its Second Amended Complaint, MHC added state-law claims of trade libel (defamation) and tortious interference with prospective economic advantage against the County and Supervisor Jacob, based on Jacob's statements. *Id.*

Defendants filed an anti-SLAPP motion to strike MHC's two state-law causes of action. Cal. Civ. Proc. Code § 425.16. The district court granted the motion, concluding that Jacob's statements were non-actionable statements of opinion rather than false assertions of fact. A week later, the court dismissed MHC's federal claims against Defendants. The court separately awarded attorney's fees on MHC's federal-law claims under 42 U.S.C. § 1988 and on the motion to strike under the anti-SLAPP statute.

A prior panel of this court affirmed the dismissal of the federal claims, but reversed the grant of the anti-SLAPP motion to strike MHC's state-law claims. The panel described MHC's argument as follows:

> MHC notes, for instance, [1] Jacob's statement that MHC "lied to the County. Said to the County that everything was fine, the sewage situation was fixed. And, in fact, it was not." MHC argues that this statement refers to specific circumstances and times and therefore is susceptible of interpretation as a provably false assertion of fact. . . . Similarly, MHC argues that a reasonable person could interpret [2] Jacob's statement that MHC "has a reputation throughout the country of running people out of older mobilehome parks, increasing the value of the park, and then selling it at a profit" as a falsifiable assertion of fact. Finally, MHC calls attention to [3] Jacob's claim that the incoming District Attorney was "very interested in following up to determine whether there are civil and/or criminal actions that should be filed against" MHC.

*MHC*, 544 F.3d at 963-64 (bracketed numbers added).

The panel concluded that although the district court "may have been correct in its assessment that each of these statements is properly interpreted as an assertion of opinion rather

than fact, a reasonable factfinder could disagree with that assessment." *Id.* at 964. It therefore held that "as to the statements concerning these matters, we cannot declare as a matter of law that no reasonable person could construe them as provably false. Accordingly, we reverse the judgment of the district court as to these statements." *Id.* The panel declined to reach the issue of whether MHC had proffered sufficient evidence to establish a probability of success in demonstrating that Jacob's statements were false, leaving that issue to the district court in the first instance. Id. at 965. Judge Callahan dissented. *Id.* at 965-69 (Callahan, J., dissenting). She argued that all of the statements were statements of opinion rather than fact, and that even if they were statements of fact, MHC had failed to make a prima facie case that the statements were false. *Id.*

On remand, Defendants filed a renewed motion to strike under the anti-SLAPP statute. The district court granted the motion. *Manufactured Home Cmtys., Inc. v. Cnty. of San Diego*, 606 F. Supp. 2d 1266 (S.D. Cal. 2009). The court analyzed only the three statements to which our prior panel had referred in its opinion. *Id.* at 1272-74. The court concluded that MHC had failed to make a prima facie showing that any of these statements was false. *Id.* It did not discuss the other statements making similar criticisms of MHC.

In a separate order, the district court awarded attorney's fees under the anti-SLAPP statute. The award included fees not only for the post-remand motion to strike, but also for the original motion to strike.

MHC appealed both the grant of the motion to strike and the award of attorney's fees. We have consolidated the two appeals.

## II.    Standard of Review

We review a district court's decision to grant a defendant's anti-SLAPP motion *de novo*. *Price v. Stossel*, 620 F.3d 992,

999 (9th Cir. 2010). Under California law, we review a trial court's award of attorney's fees for abuse of discretion. We must consider whether the district court's award "exceeded the bounds of reason." *Dove Audio, Inc. v. Rosenfeld, Meyer & Susman*, 47 Cal. App. 4th 777, 785 (1996) (internal quotation marks and citation omitted).

### III.   Discussion

### A.   Anti-SLAPP Motion to Strike

California's anti-SLAPP statute provides:

> A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.

Cal. Civ. Proc. Code § 425.16(b)(1). The statute is based on the California legislature's finding that "it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process." *Id.* § 425.16(a); *see also Gilbert v. Sykes*, 147 Cal. App. 4th 13, 21-22 (2007). The legislature instructed courts that the statute "shall be construed broadly." Cal. Civ. Proc. Code § 425.16(a).

**[1]** The California Supreme Court has described the burden a plaintiff must carry in opposing an anti-SLAPP motion:

> [T]he plaintiff must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the

> plaintiff is credited. In deciding the question of potential merit, the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant; though the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim.

*Wilson v. Parker, Covert & Chidester*, 28 Cal. 4th 811, 821 (2002) (internal quotation marks and citations omitted), *superseded by statute in part as stated in Hutton v. Hafif*, 150 Cal. App. 4th 527, 547-48 (2007). Lower California courts have described plaintiffs' burden in responding to an anti-SLAPP motion as being "similar to the standard used in determining motions for nonsuit, directed verdict, or summary judgment." *Gilbert*, 147 Cal. App. 4th at 26 (internal quotation marks and citation omitted); *see also Mindys Cosmetics, Inc. v. Dakar*, 611 F.3d 590, 599 (9th Cir. 2010).

We note that MHC may be a limited purpose public figure for the purposes of this defamation suit. *See Gilbert*, 147 Cal. App. 4th at 24-25. If MHC were a limited purpose public figure, it would be required to prove by clear and convincing evidence that Jacob's statements were false and made with actual malice. *Id.* at 26. However, Defendants have not argued that MHC is a limited purpose public figure, and we therefore treat it as a private figure.

**[2]** California law requires, in the case of a defamation claim by a private figure, that the allegedly defamatory statements be false. *Taus v. Loftus*, 40 Cal. 4th 683, 720 (2007). The issue in this case is whether MHC made a sufficient prima facie showing that Jacob's statements were false to carry its burden under the anti-SLAPP statute.

MHC contends that the district court erred in analyzing only the three statements to which we referred in our previous

opinion. Those three statements follow the bracketed numbers in the quotation from our prior opinion. *See* p. 16479, *supra*. Those statements correspond to the second, third, and fourth statements quoted in chronological order at the beginning of this opinion. *See* p. 16477, *supra* (one statement on November 18, 2002, and two statements on December 10, 2002). MHC contends that these three statements were provided as examples rather than as an exhaustive list of the relevant statements made by Jacob. It contends that the district court should have also considered the first, fifth, and sixth statements quoted at the beginning of this opinion. *See* pp. 16476-77, 16478, *supra* (statements on November 16, 2002, December 29, 2002, and January 18, 2003). We agree that the three statements to which the panel referred were intended to be examples rather than an exhaustive list. We therefore consider all six statements on appeal. We divide the statements into three groups.

### 1.      Statements Concerning MHC's Reputation

**[3]** Two of Jacob's statements concern MHC's reputation. One was made during the television interview on December 10, 2002. Jacob stated that "[MHC] has a reputation throughout the country of running people out of older mobile home parks, increasing the value of the park, and then selling it at a profit." The second was quoted in the article in the *San Diego Union-Tribune* on December 29, 2002. Jacob stated that MHC's rent hike was "a deliberate attempt to force these people out of their homes in order for the company to move newer mobile homes in, increase the value of the park and sell it for a profit. . . . They have done this throughout the country, not just here in San Diego County."

**[4]** Jacob contends, relying on a series of news articles, that these statements are true. One of the articles notes that after MHC bought Willow Lakes Estate outside of Chicago, residents "began seeing price increases of up to 14 percent," making their rents the highest known in the state. A resident quoted in the article said, "In effect, what they're telling us is

if you can't afford it, get out." A second article discusses an attempt by MHC to challenge a local rent control ordinance and to triple rents at a park in Los Osos, California. A resident said, "There's people who are going to go hungry and lose their homes if we lose our rent-stabilization law." A third article describes a public hearing in Los Osos during which audience members shouted and hissed at MHC representatives. A fourth article, focusing on MHC's rent increases at a park in Santa Cruz, California, describes MHC as having filed "a slew of simultaneous federal lawsuits against cities . . . that have rent control laws." The article describes MHC's strategy as "filing so many suits that cities cannot afford to defend them all and eventually will seek compromises with the mobile home park owners. Santa Cruz already has amassed almost $300,000 in legal bills defending its rent control ordinance since MHC first filed suit." The article notes that the outcome of these suits "could affect hundreds of thousands" of Californians, "many of them seniors on fixed incomes."

**[5]** MHC introduced no evidence that it does not have a reputation for driving up rents and forcing out existing tenants to increase the value of its parks. Instead, it contends that its activities are undertaken not to sell parks at a profit, but as part of its long-term investment in the parks. Defendants concede that MHC does not have a reputation for selling parks but contend that the part of Jacob's statement discussing the sale of parks was not defamatory.

Under California law "[i]t is well settled that a defendant is not required in an action of libel to justify every word of the alleged defamatory matter; it is sufficient if the substance, the gist, the sting of the libelous charge be justified, and if the gist of the charge be established by the evidence the defendant has made his case." *Gilbert*, 147 Cal. App. 4th at 28 (internal quotation marks and citation omitted). Furthermore, a "slight inaccuracy in the details will not prevent a judgment for the defendant, if the inaccuracy does not change the complexion

of the affair so as to affect the reader of the article different-
ly." *Id.* (internal quotation marks and citation omitted).

**[6]** We agree with Defendants that the "substance," or
"gist" and "sting," of Jacob's statements were that MHC has
a reputation for aggressively raising rents, with the result that
poor and elderly residents are forced out of MHC's parks in
order to benefit MHC. The articles upon which Defendants
rely show that it has such a reputation. Whether MHC reaps
a benefit through selling parks or through increasing rents
does not change the basic nature of Jacob's statements. We
therefore conclude that MHC failed to make a prima facie
showing that the "substance" of Jacob's statements concern-
ing MHC's reputation is false.

## 2. Statements Concerning Jacob's Interactions with Dumanis

**[7]** Two of Jacob's statements concerned her interactions
with District Attorney-Elect Bonnie Dumanis. The November
18 email sent to Lamplighter Village residents by Jacob's
assistant stated, "I have already talked with County Counsel
and District Attorney-Elect Bonnie Dumanis and they are
very interested in following up to determine whether or not
there are civil and/or criminal actions that should be filed
against [MHC]." In the meeting with Lamplighter Village res-
idents two days earlier, Jacob had said essentially the same
thing. The only difference is that she had said she was "work-
ing with" Dumanis and the County Counsel rather than saying
she had "already talked" with them.

MHC contends that Jacob's statements suggest that
Dumanis intended to bring a criminal action against MHC if
elected, and that Dumanis had no such intent. Jacob did not
say that Dumanis intended to bring a criminal action if
elected. She said only that Dumanis was interested in investi-
gating whether there was a basis for a criminal action. MHC
also contends that Dumanis was not "very interested" in look-

ing into criminal violations, and that Dumanis was not "working with" Jacob at the time Jacob made these statements.

To support its contentions, MHC relies on Dumanis's deposition, in which she stated that she never indicated to Jacob that she was more interested in investigating issues relating to MHC than she was in any other matter that might be brought to her attention. MHC also relies on the following exchange during Dumanis's deposition:

> Q.   And you mentioned that you had contact with Ms. Jacob during the course of your campaign. Did you work together or campaign together at times?
>
> A.   No. But we frequently went to the same events. . .

Finally, MHC relies on Jacob's deposition testimony that she could not remember how often she had interacted with Dumanis's office when she made her statements.

[8] Other parts of Dumanis's deposition, not mentioned by MHC, indicate that Jacob's statements were true. Dumanis testified that she "expressed [to Jacob that] if I were the district attorney this [*i.e.*, issues related to MHC] would be something I would be interested in looking into, along with some other matters." Dumanis testified that, although she did not remember the timing, Jacob had "mentioned to me some issues of concern to her that she would like me to consider as the district attorney, if I would be interested in following up on those things." Dumanis stated, "And I expressed my interest and told her that, you know, I'd have to wait until I was in office and have some research done on the topic, but I was very interested in lots of areas, including white collar type things, code enforcement type things, things that hadn't been pursued in the past." Dumanis testified that after one conversation with Jacob about MHC's potential criminal liability,

she told Jacob she "would be interested in following up on this conversation." Dumanis testified that although she did not work or campaign with Jacob, "Supervisor Jacob calls me on a regular basis. She has all of my phone numbers. I have conversations with her via the telephone on various issues. And there is just no way for me, I speak with her so frequently, to really tell you how many conversations I may have had with her on [MHC's potential civil/criminal violations]."

**[9]** MHC has not made a prima facie case that the "substance" of Jacob's statements was false. The fact that Dumanis was not more interested in MHC's activities than she was in other matters does not mean that she was not "very interested" in following up on allegations against MHC. Jacob's statement that she was "working with" Dumanis regarding potential MHC civil or criminal violations can readily be understood to mean that Jacob was in discussions with Dumanis about these violations.

### 3.    Statements Concerning the Sewage Backup

**[10]** Finally, two of Jacob's statements involve the sewage backup at Rancho Valley. During the December 10, 2002, television interview, Jacob said, "This company in this case lied to the County. Said to the County that everything was fine, the sewage situation was fixed. And, in fact, it was not." At the January 18, 2003, meeting at Lamplighter Village, Jacob said:

> MHC deliberately LIED to the County about the sewage back-up in the Dmochoskis [sic] mobile-home. MHC told the County NOT to respond to the sewage back-up in this unit because MHC said that it had everything under control. That was a lie. It was a dangerous lie for the family that lives there and who had to contend with raw sewage in their home. MHC put the health and safety of this family in jeopardy and MHC should be ashamed of itself.

**[11]** MHC contends that the first statement is false because Terry Hanifin of MHC never told Tony Torres of HIRT that the sewage situation was fixed; rather, he said only that it was under control. MHC argues the second statement is false because Hanifin did not lie in saying that "everything was under control," and because he never told the County not to respond to the sewage backup.

The precise wording of Hanifin's December 7 statement to Torres is unclear. There is hearsay evidence in the record that Hanifin said either that "the situation was under control" or that "the problem had been resolved." But MHC has put nothing in the record from the speaker, Hanifin, about what he said to Torres, even though Hanifin is its own employee. Depending on the context, there may not be a great deal of difference between a statement that a problem is "under control" and that is has been "fixed." There is virtually no difference between a problem having been "fixed" and its having been "resolved."

**[12]** We conclude that MHC has not made a prima facie case that the "substance" of Jacob's statement about what Hanifin said on December 7 was false. The situation was neither "fixed," "resolved," nor "under control." It is undisputed that work had begun on the problem created by the sewage backup when Hanifin spoke to Torres on December 7. But it is also undisputed that when Hanifin spoke to Torres the Dmochowskis' mobile home was not fit for human habitation. Indeed, Richard Haas of the Department of Environmental Health reported that the Dmochowskis were still living in the home on Monday, December 9, because they could not afford to rent rooms elsewhere. It is hard to see how a situation in which a family is living in a sewage-infested house without the means to leave three days after an initial sewage backup could truthfully be described as "under control."

When Tony Torres from HIRT called Terry Hanifin from MHC after hearing about the sewage incident, he was calling

to determine whether a HIRT response was needed. Hanifin's response, whether that the situation was "under control" or "resolved," sent the clear message to HIRT that they did not need to respond to the incident. It is undisputed that the effect of Hanifin's statement to Torres was that HIRT did not send a team to investigate the situation on December 7. HIRT did not send a team out to Rancho Valley until Monday evening, December 9, at which point the Dmochowskis had been living in their sewage-infested home for several days. We therefore conclude that MHC failed to make a prima facie case that the substance of Jacob's statements was false.

## B.   Attorney's Fees

**[13]** Under California's anti-SLAPP statute, "a prevailing defendant on a special motion to strike shall be entitled to recover his or her attorney's fees and costs." Cal. Civ. Proc. Code § 425.16(c)(1); *see also ComputerXpress, Inc. v. Jackson*, 93 Cal. App. 4th 993, 1020 (2001). In determining if a trial court abused its discretion in awarding attorney's fees, we must consider whether the trial court's award "exceeded the bounds of reason." *Dove Audio*, 47 Cal. App. 4th at 785 (internal quotation marks and citation omitted).

The district court awarded attorney's fees to the County of San Diego for work on both of Defendants' anti-SLAPP motions. In awarding attorney's fees for work on the first anti-SLAPP motion, the district court found that the "initial motion laid the groundwork for [Defendants'] eventual success in dismissing all claims pursuant to the anti-SLAPP statute." It described the first motion as "integral in achieving [Defendants'] ultimate objective."

MHC argues that *Lafayette Morehouse, Inc. v. Chronicle Publishing Co.*, 39 Cal. App. 4th 1379, 1383 (1995), precludes attorney's fees for work on the first anti-SLAPP motion. *Lafayette* held that when a suit includes causes of action not covered by an anti-SLAPP motion to strike, attor-

ney's fees incurred in obtaining dismissal of the non-anti-SLAPP causes of action cannot be awarded under the anti-SLAPP statute. *Id.* Here, however, all of the fees at issue were incurred in connection with the anti-SLAPP motions. The district court specifically found that the fees from the first motion to strike were "integral" in achieving the second anti-SLAPP motion and that "the work related to each of these statements was overlapping."[1]

MHC argues further that under the "law of the case" doctrine, the County is not entitled to recover these fees for work on the first motion because our previous decision reversed that fee award. The law of the case doctrine precludes a court "from reconsidering an issue previously decided by the same court, or a higher court in the identical case." *United States v. Lummi Indian Tribe*, 235 F.3d 443, 452 (9th Cir. 2000). The award of fees for work on the first motion is not barred by the law of the case doctrine. Our prior panel reversed the fee award because at that point Defendants were no longer the prevailing party. Now that Defendants are again the prevailing party, they are entitled to attorney's fees for work done in the course of bringing their ultimately successful anti-SLAPP motion.

**[14]** We conclude that the district court did not abuse its discretion in awarding Defendants' attorney's fees for work on their first anti-SLAPP motion based on its finding that the work relating to the two motions overlapped and that the first anti-SLAPP motion was integral to Defendants' eventual success. *See Mann v. Quality Old Time Serv., Inc.*, 139 Cal. App. 4th 328, 345 (2006) ("The fees awarded to a defendant who was only partially successful on an anti-SLAPP motion

---

[1]Furthermore, *Lafayette Morehouse* may have been superseded by statute, as recognized in *Metabolife International, Inc. v. Wornick*, 213 F. Supp. 2d 1220, 1223-24 (S.D. Cal. 2002) (noting that *Lafayette Morehouse* was decided before the California Legislature amended the anti-SLAPP statute to mandate that the statute be "construed broadly").

should be commensurate with the extent to which the motion changed the nature and character of the lawsuit in a practical way.").

## Conclusion

MHC failed to make a prima facie case that the "substance" of Jacob's statements was false. The district court did not abuse its discretion in awarding attorney's fees incurred by Defendants in bringing both anti-SLAPP motions. We therefore affirm both decisions of the district court.

**AFFIRMED.**