**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KENT H. ROBERTS,
    *Plaintiff-Appellee,*

  v.

MCAFEE, INC.,
    *Defendant-Appellant.*

No. 10-15561

D.C. No.
4:09 cv-4303 PJH

KENT H. ROBERTS,
    *Plaintiff-Appellant,*

  v.

MCAFEE, INC.
    *Defendant-Appellee.*

No. 10-15670

D.C. No.
4:09 cv-4303 PJH

OPINION

Appeal from the United States District Court
for the Northern District of California
Phyllis J. Hamilton, District Judge, Presiding

Argued and Submitted
October 14, 2011—San Francisco, California

Filed November 7, 2011

Before: Betty B. Fletcher, Stephen Reinhardt, and
A. Wallace Tashima, Circuit Judges.

Opinion by Judge Tashima

19969

**COUNSEL**

Hal K. Gillespie, Gillespie, Rozen & Watsky, PC, Dallas, Texas, for the plaintiff-appellee-cross-appellant.

Lynne C. Hermle, Orrick, Herrington & Sutcliffe LLP, Menlo Park, California, for the defendant-appellant-cross-appellee.

**OPINION**

TASHIMA, Circuit Judge:

Kent Roberts, the former General Counsel of McAfee, Inc. ("McAfee"), alleges that McAfee maliciously prosecuted and defamed him in an attempt to deflect attention from large-scale backdating of stock options within the company. McAfee moved to strike Roberts' claims pursuant to California's anti-Strategic Litigation Against Public Participation ("anti-SLAPP") statute. The district court denied the motion as to Roberts' malicious prosecution claims, but granted it as to his claims for defamation and false light invasion of privacy. Both sides appeal. We conclude that Roberts has not demonstrated that his claims have the requisite degree of merit to survive McAfee's anti-SLAPP motion: McAfee had probable cause to believe Roberts was guilty of a crime, and Roberts' claims for defamation and false light invasion of privacy are time-barred. Accordingly, we affirm in No. 10-15670, and reverse in No. 10-15561.

## I. Background

Sometime late in 2000, Roberts allowed Terry Davis, McAfee's Controller and Senior Vice President, to backdate 20,000 stock options that the company had issued to Roberts months earlier as a reward for a promotion (the "Promotion Grant").[1] Backdating refers to the practice of dating an option grant retrospectively — that is, at some earlier date when the company's stock was trading at a lower price than on the date of the grant. Because an option's strike price is typically equal to the stock price at the market's close on the grant date, changing the grant date can change the strike price. Because options grow more valuable as the stock price rises above the strike price, a lower strike price increases the value of the option. In Roberts' case, the Promotion Grant was originally authorized on July 5, 2000, but dated as of February 14, 2000, the date of his promotion, when the stock was trading at $29.62. Davis changed the date of the grant from February 14 to April 14, when the stock price closed at $19.75. This effectively lowered the strike price on Roberts' options by about $10 per share.

Backdating of this sort is not illegal *per se*. It becomes fraudulent where the company has not authorized the practice, or where the company does not report the backdating as a compensation expense. In the first situation, backdating augments the option's value, which raises the cost of the option to the company without shareholders' permission. *See United States v. Treacy*, 639 F.3d 32, 38, 48 (2d Cir. 2011) (affirming defendant's conviction for backdating stock options without authorization). In the second situation, backdating results in an overstatement of earnings, which misleads investors. *See*

---

[1]A stock option is "the right to purchase a share of stock from a company at a fixed price, referred to as the 'strike price,' on or after a specified vesting date." *United States v. Reyes*, 577 F.3d 1069, 1073 (9th Cir. 2009). "In general, companies grant options with a strike price equal to the market price on the date the options are granted." *Id.*

*Reyes*, 577 F.3d at 1073. The propriety of backdating the Promotion Grant turns on whether Davis and Roberts had the authority to backdate Roberts' options, and whether a compensation expense should have been recorded to account for the later-added benefit Roberts received.

Roberts' involvement in backdating the Promotion Grant came under scrutiny in 2006, during a nationwide probe into options backdating that implicated McAfee. On May 16, 2006, the Center for Financial Research and Analysis ("CFRA") published a report identifying seventeen companies that, judging by data showing that they had granted large numbers of options "at exercise prices and dates that matched exactly or were close to a 40-day low in the[ir] . . . stock price," had likely engaged in widespread backdating. McAfee was on the list. The report identified five suspicious McAfee option grants. Within days of the report's publication, McAfee began an internal review of its stock option practices, and the Securities and Exchange Commission ("SEC") opened an investigation the following week.

The CFRA report did not mention Roberts or any other McAfee employees by name; nor did it mention the Promotion Grant or any other grant that went to Roberts. But, in conversations with McAfee's outside counsel from Wilson Sonsini, its CEO, and two members of its Board of Directors during a shareholders' meeting in New York the week after the CFRA report came out, Roberts voluntarily disclosed the revision that he and Davis had made to the Promotion Grant.

What, exactly, Roberts said in these conversations is unclear. He contends that he raised the issue of the Promotion Grant only "in the spirit of thoroughness," and to mollify McAfee's CEO, George Samenuk, who had been involved in a large options grant that Roberts had flagged as problematic and whom Roberts worried might view the investigation as a personal attack. Roberts says he did not acknowledge any problems with his Promotion Grant, and he perceived none.

Rather, Roberts claims to have explained in each conversation that he believed Davis had authority to change the strike price, and that such a change was appropriate because the original grant date was incorrect.

The CEO and directors told a different story. Through lawyers at Howrey & Simon, whom a special committee of the Board retained to conduct an independent investigation of the backdating scandal, and later through deposition testimony, these individuals told the SEC and the U.S. Department of Justice ("DOJ") that Roberts had described "agonizing" over the issue and admitted that what he had done was wrong.

Davis had a criminal history that made Roberts' story, even his version of it, look bad. About three years after the two men modified the Promotion Grant, Davis pleaded guilty to an accounting fraud aimed principally at concealing the financial consequences of low demand for McAfee products. Roberts helped lead the internal McAfee investigation of Davis that resulted in Davis' indictment and conviction, and he does not deny that Davis was also investigated for improperly lowering the strike price on certain stock option grants. But even with the cloud of suspicion hovering over Davis, Roberts never disclosed the change Davis had "authorized" making to the Promotion Grant.

Whatever Roberts said to the CEO and directors at the May 2000 shareholders' meeting—whether he admitted culpability or not—the conversations led to his downfall at McAfee. Samenuk immediately asked Roberts to propose potential disciplinary measures; four days later, the Board voted to fire Roberts. McAfee's outside counsel informed the SEC of the termination, and the next day the company said in a press release posted on its website that Roberts had been fired because of an "improper" incident related to employee stock options. In November 2006, the Howrey lawyers, after an investigation that included periodic reports to the SEC and DOJ, presented their conclusions to the government agencies.

The presentation highlighted Roberts' modification of the Promotion Grant. It also highlighted Roberts' involvement in backdating two other stock option grants approved in January 2002—a grant of 420,000 options to Samenuk (the "Samenuk Grant") and a grant of 500,000 options to a newly hired executive named Art Matin (the "Matin Grant").

In late February 2007, the DOJ procured an indictment and the SEC filed a civil complaint. Both actions focused on the Promotion Grant, but not exclusively. They also accused Roberts of wrongdoing in connection with the Samenuk Grant. The Board's Compensation Committee had met and approved that grant on January 15, 2002, when the stock closed at $27.19. As Corporate Secretary, Roberts attended the meeting. The next day, the stock dipped to $25.43, and, according to the indictment and SEC complaint, Roberts unilaterally decided to re-price the options to that lower price. He then allegedly falsified the Board minutes to make it appear that the Board had voted to price the options as of the 16th, rather than the 15th. An inconsistency in successive emails from Roberts—the first called January 15 the effective date, and the second called January 16 the effective date—supported these allegations.

The SEC also alleged that Roberts had acted "recklessly" in connection with the Matin Grant. According to its complaint, the Compensation Committee voted on January 15, 2002, to grant Matin the options with a strike price corresponding to the market price of October 30, 2001, even though Matin did not begin work at McAfee until December 2001 and the company's options policy prohibited option grants with effective dates before an employee's date of hire. Roberts, who attended the January 15, 2002, meeting, subsequently approved corporate disclosures that represented—incorrectly—that Matin had begun work on October 30, 2001.

A few months before Roberts' criminal trial began, the tide began to turn in his favor. The SEC's deposition of Ed Har-

per, a member of McAfee's Board and Compensation Committee, produced testimony that undermined the Samenuk Grant allegations. Although Harper seemed unable to remember exactly what the Compensation Committee had decided during its January 15 meeting, he said he had no reason to disagree with the indication in the minutes of that meeting that the Committee—not Roberts—had decided to price the Samenuk Grant as of January 16. A few weeks after that deposition, federal prosecutors dropped the charges based on the Samenuk Grant, leaving the Promotion Grant as the sole subject of the criminal case.

After the first day of the criminal trial, Roberts got more good news. McAfee belatedly produced a series of emails showing that Roberts had openly corresponded with an employee of Stock Options Solutions, Inc. ("SOS"), the contractor that tracked and audited McAfee's stock options, about finalizing the revised Promotion Grant and having it entered into the company's database. These emails, which McAfee had failed to produce in response to earlier subpoenas, called into serious question an allegation in both the indictment and SEC complaint that Roberts and Davis had secretly changed the information in the database by themselves.

Perhaps most damaging to the criminal case, however, were some characteristics of the Promotion Grant itself, which Howrey had not included in its presentation to the government. Roberts presented evidence that the Promotion Grant may have been revised to correct a defect rather than to perpetrate a fraud. Roberts received his promotion on February 14, 2000, but, as the Personnel Action Form ("PAF") for the promotion clearly shows, he did not receive any stock options on that date. Instead, he received options as a reward for the promotion about five months later, on July 5, 2000, when McAfee's CFO and Davis jointly signed a new PAF granting Roberts 20,000 options with an exercise price "as of 2-14-00," the date of the promotion. The stock had closed at $29.62 on February 14, and at $19.69 on July 5, which meant that the

options were deeply underwater when the company finally issued them. At trial, a McAfee board member testified that he had never seen the company issue a grant that was underwater when given. Roberts' counsel also emphasized another intriguing fact: the strike price as revised ($19.75) was actually *higher* than the stock price on the date the grant originally issued ($19.69). So Roberts could have obtained an even more favorable strike price by re-dating the Promotion Grant as of the actual grant date.

The evidence at Roberts' criminal trial also suggested that Davis may have had authority to issue options on his own. The Board had delegated to the CEO authority to issue option grants of up to 15,000 shares in 1997, which would be "adjusted from time to time to reflect recapitalizations, stock splits . . . or similar events." The Board approved a 3-for-2 stock split in 1998, and Roberts argued that the split correspondingly increased the CEO's option-granting authority by a factor of 1.5, to 22,500 shares. The evidence also suggested that the CEO may have delegated his authority to lower-level executives, including Davis. Although there is no documentation of the delegation to lower-level executives, there are some indications that it occurred in practice.

As Roberts' counsel acknowledged, these arguments did not definitively resolve every question about the Promotion Grant. If Davis had the power to unilaterally grant options to Roberts (or unilaterally re-price them), why did the Compensation Committee need to approve them? Why did Roberts not disclose the revision to his Promotion Grant during the investigation of Davis for stock options backdating two years later? And why did Davis and Roberts think April 14, 2000, was a more logical date for setting the strike price than the date of Roberts' promotion? April 14 may have been the day after the first Compensation Committee meeting following the promotion, but it also happened to be a day on which McAfee's stock price dropped sharply.

Despite these lingering questions, the jury acquitted Roberts of two fraud charges, and was unable to reach a verdict as to whether Roberts had deprived McAfee of "honest services,"[2] and as to whether he had falsified books and records. Prosecutors voluntarily dismissed the outstanding counts with prejudice the day after the verdict issued. Several months later, the SEC dismissed its civil case pursuant to a stipulation in which Roberts waived any right to pursue attorney's fees.

This lawsuit followed. Roberts asserts claims for malicious prosecution, defamation, and false light invasion of privacy. The district court denied in part and granted in part McAfee's motion to strike under the anti-SLAPP statute.[3] Citing "disputed issues of fact regarding information provided by McAfee to the government investigators," it denied the motion to strike Roberts' malicious prosecution claims. But it granted the motion to strike his defamation and false light claims as time-barred.[4]

## II.   Jurisdiction and Standard of Review

The collateral order doctrine gives us jurisdiction to review the district court's denial of the anti-SLAPP motion to strike

---

[2]After *Skilling v. United States*, 130 S. Ct. 2896 (2010), Roberts could not be convicted on these honest services charges, because he was not alleged to have engaged in bribery or kickbacks. *United States v. Pelisamen*, 641 F.3d 399, 402 (9th Cir. 2011) ("[*Skilling*] held that the offense of honest-services fraud . . . is unconstitutionally vague when applied to conduct other than bribery and kickbacks.").

[3]McAfee also moved to dismiss the claims under Fed. R. Civ. P. 12(b)(6), but this Court does not have jurisdiction to review the district court's disposition of that motion, *Hilton v. Hallmark Cards*, 599 F.3d 894, 902 (9th Cir. 2010) (holding that a motion to dismiss is not "inextricably intertwined," for purposes of pendent jurisdiction, with a motion to strike the same claim), and the parties do not ask the court to conduct such a review.

[4]The district court also struck these claims on the ground that the allegedly defamatory statement was one of opinion, not fact. Because we agree that the claims are time-barred, we do not reach that issue.

Roberts' malicious prosecution claims. *Mindys Cosmetics, Inc. v. Dakar*, 611 F.3d 590, 595 (9th Cir. 2010). Because we reverse that portion of the district court's decision, its decision to strike Roberts' remaining claims—for defamation and false light invasion of privacy—is a final order, which we have jurisdiction to review pursuant to 28 U.S.C. § 1291.

We review *de novo* a district court decision on a motion to strike under California's anti-SLAPP statute. *Mindys Cosmetics*, 611 F.3d at 595. The anti-SLAPP statute requires a two-part analysis: (1) the defendant must make a *prima facie* showing that the suit arises "from an act in furtherance of the defendant's rights of petition or free speech"; and (2) once the defendant makes this showing, "the burden shifts to the plaintiff to demonstrate a probability of prevailing on the challenged claims." *Id.* (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1110 (9th Cir. 2003)). Roberts does not dispute that McAfee has made a *prima facie* showing on the first prong; thus, the sole question presented is whether he has demonstrated a "probability of prevailing" on his claims.

In the anti-SLAPP context, "probability" is a low bar. To withstand an anti-SLAPP motion to strike in California,

> the plaintiff must demonstrate that the complaint is both legally sufficient and supported by a sufficient *prima facie* showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited. In deciding the question of potential merit, the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant; though the court does not weigh the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim.

*Manufactured Home Communities, Inc. v. Cnty. of San Diego*, 2011 WL 3771277, at *4 (9th Cir. Aug. 26, 2011) (internal alterations and quotation marks omitted). The plaintiff's burden resembles the burden he would have in fending off a motion for summary judgment or directed verdict. *Gilbert v. Sykes*, 53 Cal. Rptr.3d 752, 763 (Ct. App. 2007); *see also Mindys Cosmetics*, 611 F.3d at 599.

### III.   Malicious Prosecution Claims

**[1]** To succeed on a malicious prosecution claim under California law, a plaintiff must prove that the prior action: "(1) was commenced by or at the direction of the defendant and was pursued to a legal termination in his, plaintiff's, favor; (2) was brought without probable cause; and (3) was initiated with malice." *Paiva v. Nichols*, 85 Cal. Rptr. 3d 838, 848 (Ct. App. 2008) (quoting *Bertero v. Nat'l Gen. Corp.*, 529 P.2d 608, 613-14 (Cal. 1974)). We conclude that Roberts cannot meet his burden on the second element; thus, we do not reach the first or third elements.

**[2]** Probable cause for the initiation of a criminal prosecution exists where "it was objectively reasonable for the defendant to suspect the plaintiff had committed a crime." *Conrad v. United States*, 447 F.3d 760, 768 (9th Cir. 2006) (alterations omitted) (quoting *Ecker v. Raging Waters Group, Inc.*, 105 Cal. Rptr. 2d 320, 326 (Ct. App. 2001)). Whether probable cause existed on the facts known to the defendant is a question of law for the court. *Sheldon Appel Co. v. Albert & Oliker*, 765 P.2d 498, 503-04 (Cal. 1989). What facts the defendant knew is an issue of fact for the jury, but only to the extent the scope of the defendant's knowledge is disputed. *Id.*

In this case, although many facts are disputed, several key facts are not. Those undisputed facts establish that McAfee had probable cause to accuse Roberts of participating in the illegal backdating of three stock option grants — the Promotion Grant, the Samenuk Grant, and the Matin Grant —

regardless of whether McAfee or its agents misrepresented evidence to government investigators.

## A.  The Promotion Grant

[3] Assuming, as we must at this stage, that Roberts' sworn allegations are correct, McAfee falsified and withheld evidence to make his culpability seem clearer than it really was. According to Roberts, McAfee or its agents said that he had confessed when he had not, and offered an incomplete picture of the Promotion Grant to exaggerate the degree of suspicion created by his conduct. If Roberts is right, McAfee behaved inexcusably. But, under California law, lying about the facts is not enough to destroy probable cause. In *Sheldon Appel*, the California Supreme Court held that, so long as the evidence known to the defendant could support an *objectively reasonable* suspicion — regardless of whether the defendant actually possessed such a suspicion — the defendant is not liable for malicious prosecution. *Sheldon Appel*, 765 P.2d at 506-07. By that same reasoning, a defendant who fabricates evidence still acts with probable cause if the defendant is aware of other evidence which would make it objectively reasonable to suspect the plaintiff's guilt. *See Sangster v. Paetkau*, 80 Cal. Rptr. 2d 66, 76-77 (Ct. App. 1998) (despite evidence that defendant had leveled false accusations at plaintiff in a fraud complaint, defendant acted with probable cause because she possessed other, unfabricated evidence that plaintiff had defrauded her) ("If undisputed facts in the record do establish an objectively reasonable basis for bringing the underlying action, the existence of other, allegedly disputed facts is immaterial"); *see also McSherry v. City of Long Beach*, 584 F.3d 1129, 1142 (9th Cir. 2009) (in federal malicious prosecution action against police officers, evidence that officers had fabricated a child rape victim's description of the accused's home did not show a lack of probable cause because other evidence, including the victim's positive identifications of the accused, established an objectively reasonable basis for suspicion).

To be sure, McAfee would lack probable cause had it fabricated the entire predicate for its claim. *See Sierra Club Found. v. Graham*, 85 Cal. Rptr. 2d 726, 737 (Ct. App. 1999) ("A litigant will lack probable cause for his action . . . if he relies upon facts which he has no reasonable cause to believe to be true . . . .") (internal quotation marks omitted). But that is because, in such a case, the defendant would know of *no* facts that could provide reason to suspect the plaintiff of wrongdoing. *See id.* ("[I]f defendant knows that the facts he or she is asserting are not true, then defendant's knowledge of facts which would justify initiating suit is zero, and probable cause is nonexistent."); *see also Sheldon Appel*, 765 P.2d at 506 ("[T]he probable cause element calls on the trial court to make an objective determination of the 'reasonableness' of the defendant's conduct, *i.e.*, to determine whether, on the basis of the facts known to the defendant, the institution of the prior action was legally tenable.").

**[4]** Here, by contrast, even if McAfee misrepresented certain aspects of the Promotion Grant to make Roberts look worse, it was also aware of other facts that, on their own, provided objectively reasonable suspicion that Roberts had committed a crime. McAfee knew that, in May 2006, Roberts had told McAfee's CEO and two directors that he and Davis had reduced the strike price on the Promotion Grant months after the grant issued. McAfee also knew that Davis had been convicted of fraud three years after the revision; that McAfee had investigated Davis for issuing and repricing options without authorization; that Roberts had led McAfee's investigation of Davis' conduct; and that Roberts still failed to report the change to the Promotion Grant until about four years after that investigation, when the SEC announced a new investigation into McAfee's options practices in mid-2006. While these facts are far from conclusive of Roberts' culpability, they at least gave McAfee reason to suspect that Davis lacked the authority to revise the grant, that he and Roberts changed the grant just to make it more lucrative, and that the criminality of the act caused Roberts to keep mum about it during the

Davis investigation. While Roberts was eventually successful in beating back the criminal and civil enforcement actions against him, the ultimate failure of a lawsuit does not mean there was no probable cause to bring it. *See Sheldon Appel*, 765 P.2d at 511.

**[5]** Indeed, even the facts as known today do not immediately suggest a compelling explanation for why Roberts thought it appropriate for the Controller to lower by one-third the strike price of options that had already been ratified by the Compensation Committee. The facts upon which Roberts won acquittal may give rise to reasonable doubt, but they do not destroy reasonable suspicion.[5]

## B. The Samenuk and Matin Grants

**[6]** McAfee also had reason to suspect Roberts of wrongdoing in connection with the Samenuk and Matin grants. Roberts' own emails suggested he had made a unilateral decision to lower the exercise price for the Samenuk Grant after the Compensation Committee approved it. On January 15, the day of the Committee meeting, Roberts wrote an email to other executives explaining that the Committee had approved the grant "as of January 15, 2002 at $27.19." The next day, when the share price dropped, he wrote in another email, "Let's price the 420,000 option shares at today's closing price of $25.43." True, the meeting minutes that Roberts prepared reflected that the grant was to be priced as of the 16th, not the 15th, and one Committee member who testified could not say that the minutes had been falsified. But these facts do not defeat probable cause. The discrepancy between Roberts' two

---

[5]That makes Roberts' citation to *Zamos v. Stroud*, 87 P.3d 802 (Cal. 2004), inapposite. While a prosecution initiated with probable cause may become malicious if the instigating party fails to terminate the action upon learning facts that extinguish any reasonable suspicion, *id.* at 803, McAfee never learned such game-changing facts about Roberts' involvement in backdating the Promotion Grant.

emails would justify reasonable suspicion that he revised the price unilaterally and later conformed the meeting minutes to his action.

In addition, under California law, the indictment itself created a *prima facie* presumption "that probable cause existed for the underlying prosecution." *Conrad*, 447 F.3d at 768. Although the presumption may be rebutted if the indictment was based on false evidence, *Williams v. Hartford Ins. Co.*, 195 Cal. Rptr. 448, 452 (Ct. App. 1983), Roberts has never suggested that that is what happened here. Howrey disclosed the meeting minutes along with Roberts' emails in its presentation. On the basis of that evidence, prosecutors made an independent decision to charge him for improperly backdating the Samenuk Grant, and that charging decision created a presumption of probable cause that Roberts has not rebutted.

**[7]** There was likewise probable cause of wrongdoing with respect to the Matin Grant. The SEC alleged that Roberts signed proxy statements that he knew, or should have known, failed to disclose that the grant had been backdated to a date before Matin began working at McAfee. Roberts clearly knew about the backdating; his notes from the committee meeting authorizing the grant say "Art Matin, Backdating of options." And Roberts does not deny that he signed the misleading proxy statements. His only complaint is that Howrey's presentation omitted a page of Roberts' notes reflecting that the Compensation Committee had approved the backdating. But the SEC never alleged that the grant lacked formal approval — just that Roberts signed off on misleading documents about when Matin began working at McAfee. The evidence suggests that this is exactly what he did.

**[8]** Because McAfee had reason to suspect that Roberts participated in wrongfully backdating the Promotion Grant, the Samenuk Grant, and the Matin Grant, McAfee's motion to strike the malicious prosecution claims should have been granted.

## IV. Defamation and False Light Claims

Roberts' defamation and false light claims stem from the press release McAfee posted on its website on May 30, 2006, which asserted that Roberts had acted "improper[ly]" in connection with stock options. The press release remained up on McAfee's website as late as November 2009. Because Roberts did not file suit until September 16, 2009, more than three years after the press release was first posted, the district court struck the claims as time-barred under the applicable one-year statute of limitations, Cal. Code Civ. P. § 340(c). We agree.

**[9]** California Civil Code § 3425.3 sets forth a "single-publication" rule that governs the statute of limitations analysis where a statement made in a mass communication forms the basis of a tort action:

> No person shall have more than one cause of action for damages for libel or slander or invasion of privacy or any other tort founded upon any single publication or exhibition or utterance, such as any one issue of a newspaper or book or magazine or any one presentation to an audience or any one broadcast over radio or television or any one exhibition of a motion picture. Recovery in any action shall include all damages for any such tort suffered by the plaintiff in all jurisdictions.

Cal. Civ. Code § 3425.3 (West 1997). The single-publication rule limits tort claims premised on mass communications to a single cause of action that accrues upon the first publication of the communication, thereby "spar[ing] the courts from litigation of stale claims" where an offending book or magazine is resold years later. *Christoff v. Nestle USA, Inc.*, 213 P.3d 132, 138 (Cal. 2009) (quoting *Gregoire v. G.P. Putnam Sons*, 81 N.E.2d 45, 48 (N.Y. 1948)). The rule applies to false light, as well as to defamation claims. *Id.* at 137; *see Fellows v. Nat'l Enquirer, Inc.*, 721 P.2d 97, 104 (Cal. 1986) (citing

*Fouts v. Fawcett Publ'ns*, 116 F. Supp. 535, 537 (D. Conn. 1953)). And, as Roberts concedes, the rule encompasses statements published on internet websites. Although the California Supreme Court has not addressed the issue, the California Courts of Appeal have uniformly applied the rule to websites. *See Traditional Cat Ass'n, Inc. v. Gilbreath*, 13 Cal. Rptr. 3d 353, 355 (Ct. App. 2004) ("[T]he single-publication rule applies to statements published on Internet Web sites."); *id.* at 362 ("[W]e have very little doubt that . . . our Supreme Court would find that . . . interests [in free expression] require application of the single-publication rule to Web-page publication."); *Long v. Walt Disney Co.*, 10 Cal. Rptr. 3d 836, 838, 840-41 (Ct. App. 2004); *Ibarra v. Carpinello*, 2011 WL 925719, at *9 (Cal. Ct. App. 2011) (unpublished) ("Defendants' publication on the Internet, no matter how long it remained available thereafter, is deemed a single publication as of the date it was first posted."); *Taylor v. Kuwatch*, 2004 WL 1463046, at *1 (Cal. Ct. App. 2004) (unpublished) ("The uniform single publication rule . . . applies to publication on the Internet."); *see also Lockton v. Small*, 2005 WL 357890, at *20 (Cal. Ct. App. 2005) (unpublished) (describing as "persuasive" decisions from other states that hold that "the single publication rule applies to the Internet and that the first posting establishes the publication date.");[6] *Oja v. U.S. Army Corps of Eng'rs*, 440 F.3d 1122, 1133 (9th Cir. 2006) (applying common-law single-publication rule to internet publications).

[10] Information is generally considered "published" within the meaning of the single-publication rule when it is first made available to the public, *Traditional Cat Ass'n*, 13 Cal. Rptr. 3d at 359; that happened here when McAfee first

---

[6]Even though unpublished California Courts of Appeal decisions have no precedential value under California law, the Ninth Circuit is "not precluded" from considering such decisions "as a possible reflection of California law." *Employers Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n.8 (9th Cir. 2003).

posted the press release on its website in 2006. Roberts acknowledges, as he must, that any claim based on that initial publication is time-barred. But he contends McAfee's failure to take down the press release "once it received substantial indications of falsity" amounted to a republication, restarting the limitations period and keeping his defamation and false light claims alive.[7]

**[11]** We are not persuaded that Roberts' argument correctly foretells California law. He cites no case that actually espouses the theory, and other courts have rightly rejected similar theories. *See D.A.R.E. America v. Rolling Stone Magazine*, 101 F. Supp. 2d 1270, 1287 (C.D. Cal. 2000) ("There is no authority to support Plaintiffs' argument that a publisher may be liable for defamation because it fails to retract a statement upon which grave doubt is cast after publication."); *Lockton*, 2005 WL 357890, at *21 ("[W]e fail to see the connection between a refusal to retract and the expectation of republication."); *see also Coughlin v. Westinghouse Broad. & Cable, Inc.*, 689 F. Supp. 483, 488 (E.D. Pa. 1988) ("Counsel have not been able to come up with any case in any American jurisdiction which recognizes a claim sounding in damages for failure to retract what is defamatory.").

**[12]** The fundamental problem with Roberts' theory — that a mass communication is republished when the defendant fails to retract it after receiving notice of its falsity — is that it undermines the single-publication rule. That rule is designed to provide repose to defendants by precluding stale claims based on dated but still-lingering mass communications. *See Traditional Cat Ass'n,* 13 Cal. Rptr. 3d at 358-59. But if we were to adopt Roberts' position, repose would never

---

[7]Roberts mentions in passing that this failure happened in "the context of an otherwise evolving website" but does not argue that the evolution amounted to a republication. Accordingly, we need not decide the circumstances in which alterations to a webpage might be so extensive as to constitute a republication of that webpage.

be certain. A newspaper article published forty years ago whose veracity is called into question today could subject the publisher to a defamation suit. Such a result would be entirely at odds with the goal of the single-publication rule. *See Christoff*, 213 P.3d at 138.

Roberts fails to address this problem. Instead, he cites inapposite authorities concerning a property-owner's liability for defamatory matter published on her property by a third party. *See Hellar v. Bianco*, 244 P.2d 757 (Cal. Ct. App. 1952) (holding that the proprietor of a public venue, such as a tavern, becomes liable for defamation if she learns that a third party has written a defamatory statement on the venue's walls and fails to remove it); *Barnes v. Yahoo! Inc.*, 570 F.3d 1096, 1103 (9th Cir. 2009) (defamation sometimes imposes an "affirmative duty to remove a publication made by another"); *Tacket v. Gen. Motors Corp.*, 836 F.2d 1042, 1046 (7th Cir. 1987) ("Failing to remove a libel from your building, after notice and opportunity to do so, [can form a basis for liability]."); Restatement (Second) of Torts § 577(2) (1977) (explicating the rule set forth in *Hellar*). None of these authorities addresses the definition of republication; indeed, none addresses the single-publication rule at all.

Roberts' reliance on Justice Werdegar's concurrence in *Christoff* is also misplaced, even assuming that it is a reliable guidepost on how the California Supreme Court would rule. The issue in *Christoff* was whether the defendant's continued issuance of tortious material (coffee-can labels bearing an unauthorized image of the plaintiff) was subject to the single-publication rule and, if so, how that rule applied. *Christoff*, 213 P.3d at 133. The majority remanded on the issue of whether Nestle's continued production of substantially identical coffee-can labels for several years was a single integrated publication. In a concurrence, Justice Werdegar attempted to provide guidance on what might count as republication in such circumstances.

Neither the majority opinion nor Justice Werdegar's concurrence said anything about whether a company's inaction — its failure to retract a publication — could amount to a republication. And, while Justice Werdegar's concurrence was not adopted by the majority and therefore is not the law of California, even if it were, it would not help Roberts. In her concurrence, Justice Werdegar suggested that, "where a publication has been out of print or unavailable in digital form for some time and the publisher makes a conscious decision to reissue it or again make it available for download," a republication has occurred. *Id.* at 143 (Werdegar, J., concurring). Roberts does not allege that McAfee took either step here. It did not issue an altered version of the press release on its website, or even reissue the press release itself in identical form. Instead, as Roberts concedes, all it did after May 2006 was to continue to host the press release on its website. That kind of inaction is not a republication. *See Oja*, 440 F.3d at 1132 (hosting "concerns technical maintenance rather than the particularized and original effort involved in publishing information to an audience"); *Christoff*, 213 P.3d at 143 (Werdegar, J., concurring) ("Where the publisher has set up a more or less automated system for printing and distributing an item or for downloading it in digital form and does not make a separate publishing decision as to each copy or small batch of copies, to call each such distribution a new 'issue' of the material would defeat the purposes of the single publication rule."); *see also Traditional Cat Ass'n*, 13 Cal. Rptr. 3d at 362 ("[T]he need to protect Web publishers from almost perpetual liability for statements they make available to the hundreds of millions of people who have access to the Internet is greater even than the need to protect the publishers of conventional hard copy newspapers, magazines and books.").

Roberts contends that, at the very least, the district court should have allowed him to take discovery, pursuant to Rule 56(d) of the Federal Rules of Civil Procedure,[8] concerning

---

[8]Roberts' motion for discovery was brought pursuant to Rule 56(f), which has since been relocated to Rule 56(d).

McAfee's alleged "republication of the defamatory press release." But this rule requires discovery only "where the non-moving party has not had the opportunity to discover information that is essential to its opposition." *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 846 (9th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986)). Roberts' motion sought discovery into "McAfee's awareness of the falsity of the press release and the decision to maintain it on the company's publicly available website following Roberts'[ ] acquittal." Such evidence was not essential to Roberts' opposition; it would not affect the statute of limitations analysis under California's single- publication rule. The district court therefore acted well within its discretion in denying the motion. *See Getz v. Boeing Co.*, 654 F.3d 852, 868 (9th Cir. 2011) (affirming under abuse-of-discretion standard the denial of a Rule 56(f) discovery motion where the party "failed to 'proffer sufficient facts to show that the evidence sought exist[ed], and that it would [have] prevent[ed] summary judgment.' " (quoting *Blough v. Holland Realty, Inc.*, 574 F.3d 1084, 1091 n.5 (9th Cir. 2009))).

**[13]** Because Roberts' defamation and false light claims were not brought within one year of the initial publication of the press release, they are time-barred, and the district court rightly struck them.

## V. Conclusion

**[14]** For the reasons set forth above, we affirm the district court's order granting McAfee's anti-SLAPP motion to strike Roberts' claims for defamation and false light invasion of privacy, but reverse its order denying McAfee's anti-SLAPP motion to strike Roberts' malicious prosecution claims and remand to the district court with directions to enter judgment dismissing Roberts' action. Costs on appeal are awarded to McAfee.

In No. 10-15670, the order of the district court is **AFFIRMED**.

In No. 10-15561, the order of the district court is **REVERSED and REMANDED.**