Filed 5/16/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| GARY GREENE, | B243638 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC478655) |
| v. | |
| BANK OF AMERICA et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Frank Johnson, Judge.  Affirmed in part; reversed in part.

Akudinobi & Ikonte, Emmanuel C. Akudinobi, Chijioke O. Ikonte for Plaintiff and Appellant.

Severson & Werson, Jan T. Chilton, Andrew S. Elliott for Defendants and Respondents.

———————————

Plaintiff and appellant Gary Greene received two checks from State Farm, in settlement of a claim. He went to a Bank of America branch (the Bank) and attempted to cash the checks, which were made out to him and drawn on State Farm's Bank of America account. The Bank refused to cash the larger of the two checks and, after a time, the branch manager called police and said that plaintiff had threatened to blow up the Bank. Police responded and arrested plaintiff. He was charged with a violation of Penal Code section 422 and was acquitted after jury trial.

Plaintiff sued the Bank and the branch manager, Jenny Casasola,[1] for malicious prosecution. Judgment was entered in respondents' favor after their special motion to strike (Code Civ. Proc., § 425.16) was granted. We reverse.


Special Motions to Strike

"When a special motion to strike is filed, the initial burden rests with the defendant to demonstrate that the challenged cause of action arises from protected activity." (*Brill Media Co., LLC v. TCW Group, Inc.* (2005) 132 Cal.App.4th 324, 329.)

The parties agree that defendants met their initial burden. We thus focus on the next step. Once defendants show that the cause of action arises from protected activity, the plaintiff must demonstrate a probability of prevailing on the claim. (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67.)

In making the showing, "a plaintiff . . . must set forth evidence that would be admissible at trial. [Citation.] Precisely because the statute (1) permits early intervention in lawsuits alleging unmeritorious causes of action that implicate free speech concerns, and (2) limits opportunity to conduct discovery, the plaintiff's burden of establishing a probability of prevailing is not high: We do not weigh credibility, nor do we evaluate the weight of the evidence. Instead, we accept as true all evidence favorable to the plaintiff and assess the defendant's evidence only to determine if it defeats the plaintiff's

---

[1] Plaintiff sued another bank employee, Yahaira Reyes. Judgment was entered in her favor, but plaintiff makes no argument concerning her on appeal. Judgment in her favor is thus affirmed.

submission as a matter of law. (*Ibid.*) Only a cause of action that lacks 'even minimal merit' constitutes a SLAPP. [Citation.]" (*Overstock.com, Inc. v. Gradient Analytics, Inc.* (2007) 151 Cal.App.4th 688, 699-700.)[2] "Put another way, the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' [Citations.]" (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821.)

Whether Code of Civil Procedure section 425.16 applies is a legal question which we review independently on appeal. (*ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 999.)

Evidence

Plaintiff's trip to the Bank began with a teller, who told him that she could cash the smaller of his two checks, which was for $40, but not the larger check, which was for $7,250.97. For that, she needed authorization from her supervisor, Yahaira Reyes. Reyes either could not or would not cash the larger check. Plaintiff then talked to the branch manager, Casasola. It was Casasola who called the police and said that plaintiff was threatening to blow up the Bank. Plaintiff was outside the Bank, smoking a cigarette and waiting for his checks to be verified, when he was arrested. That much, plaintiff and defendants agree on.

Defendants submitted evidence with their motion to strike, and plaintiff submitted evidence with his response to that motion; their accounts of the events differ.

Plaintiff declared that on February 25, 2010, he picked up two checks from the Woodland Hills office of his car insurer, State Farm. Both were on State Farm's Bank of America account, and they were signed by the same person. The State Farm employee who gave him the checks told him that he could cash the checks at the Bank of America

---

[2] Given this standard, we must ignore the many portions of defendants' brief which argue the case as if the only facts were the facts it proposed.

branch nearby on Canoga Avenue, and that the checks were "preapproved and easily verifiable based on a long standing agreement between State Farm and Bank of America."

Plaintiff went to the branch the State Farm employee recommended and waited in line for a teller. The teller told him that since he did not have a Bank of America account, the Bank would charge him to cash the checks. He knew that that might be the case, and told her that he did not have a problem with that. At the teller's request, he endorsed the checks. The teller then said that she could cash the smaller check, but that the larger check needed approval from her supervisor.

The supervisor, Reyes, came to the window and said that she could not cash the check unless plaintiff opened an account. Plaintiff told her that he did not want to open an account, that he needed the money right away (he had arranged to buy a car), and that State Farm had told him that the checks were preapproved. Reyes said that she could not verify the signature on the larger check and that he would have to deposit it.

Plaintiff called State Farm and told a claims adjuster, Charles Gonzalez, what was going on. Gonzalez asked to speak to Reyes, but she refused to talk to him or to give plaintiff her phone number, so that Gonzalez could call her. Plaintiff was able to get Reyes's business card from the teller. He gave Reyes's phone number to Gonzalez, and shortly thereafter heard Reyes's phone ring.

Plaintiff submitted State Farm's records concerning the call. Gonzalez wrote that he spoke to Reyes and told her that he could verify the check, specifying the check number, amount, and the name of the employee who had signed it. Reyes said that the Bank had copies of the signatures of all State Farm employees who could issue checks, and that she could not match the signature on plaintiff's check. Gonzalez expressed skepticism, never having had any similar problem before. Reyes simply repeated that she could not verify the signature.

Plaintiff declared that while Reyes was on the phone and afterward, he took a seat in the lobby and waited, but after an "appreciable time" got up and asked Reyes about his money. She ignored him. He asked for his checks back. She ignored him. Plaintiff

4

complained, telling her that he was going to talk to her manager and call the police, who would make her give him his checks.

Reyes continued to ignore him. Plaintiff then sought out Casasola, the branch manager. Casasola was talking to another dissatisfied customer. Plaintiff was frustrated and "began venting" about the bad customer service at the Bank. He did not, however, threaten anyone, or make any threat about blowing up the Bank.

Plaintiff declared that while he waited for Casasola to finish speaking to the other customer, he saw Reyes approach Casasola's desk and give Casasola his checks. When he finally was able to speak to Casasola, he told her that he wanted to cash the checks and gave her his identification and Gonzalez's phone number. She promised to take care of the problem. Plaintiff thanked her and asked for permission to wait outside, so that he could smoke. Casasola agreed. Plaintiff went outside to smoke. He was outside, smoking, when police arrived and arrested him.

Plaintiff declared that he never balled up his fists, or threatened any person or bank property with physical harm.

According to Reyes's and Casasola's declarations, Reyes sought to verify the signature on the check, using a specified bank system, but could not do so. Plaintiff became "highly agitated," raised his voice, called Reyes a "bitch," and threatened to cause a commotion. Plaintiff then approached Casasola.

Casasola declared that she asked plaintiff to wait, and when he would not, got the checks from Reyes, whom she observed to be "visibly upset" and "on the verge of tears." Casasola then told plaintiff to sit down, calm down, and lower his voice. He stood about 10 feet away from her and shouted threats, saying that he was not afraid of the police, that he was "going to blow shit up," that he was an ex-convict, and that he was not afraid to blow the place up or break the doors. As he was making these threats, he was balling his fists, throwing his arms in the air, and taking "an aggressive physical stance."

It was at this time that Casasola called police.

In the 911 call, Casasola said that plaintiff was in the Bank branch and "he's saying he can blow 's' up if I don't help him he's going to do that. I need a unit over here,

5

please." She said that plaintiff was "threatening associates," and that he had "threatened to blow up the Bank" and to break her glasses (or break the glass) as he left the Bank. The dispatcher got plaintiff's description and Casasola's name, and told her that "if anything changes call us back." The dispatcher also asked if Casasola had plaintiff's name. She said, "No, but I can get it as soon as I sit down with him."

Casasola did sit down with plaintiff, who, according to her declaration, calmed down and sat at her desk. Casasola left plaintiff, went to Reyes's work station, and told her to continue trying to verify the checks. At that point, plaintiff told Casasola that he was going outside to smoke.

After plaintiff posted bail, he took the checks (which police had retrieved and given to him) to another bank branch, where the manager verified the checks by calling a bank hotline. Plaintiff had his cash in less than five minutes.

Plaintiff also submitted Casasola's testimony in the criminal proceedings. At the preliminary hearing, Casasola testified that plaintiff said, "If you don't cash this check for me, I am not afraid to blow up this place" and that plaintiff said that he would blow up the banking center if she did not cash his check. She also testified that after she called police she sat with plaintiff at her desk, and that in the five to seven minutes it took for police to arrive, she was worried about her safety and the safety of others in the Bank. She did not, however, evacuate the Bank, warn customers or employees, look for security guards who might help, or lock the doors after plaintiff went outside. She also testified that she needed to verify the larger check because it was for an amount in excess of $10,000.

In addition to the evidence previously summarized, defendants submitted a portion of plaintiff's preliminary hearing transcript in which he testified that while he was at the Bank, he said, in a loud voice, that he was so frustrated that he felt like kicking over a cardboard display in the Bank, although he did not go near the display. He also testified that he had "yelled at the teller," "mouthed off," and "abused the peace of the Bank," explaining that he abused "the tranquility," and that "I was loud," but that he did not call anyone names. He also testified that when Reyes refused to give his checks back, he told

6

her, "you are afraid that I will complain about you; . . . you have control issues." He was trying to put her "on blast," or embarrass her for providing bad customer service.[3]

Defendants also submitted a different portion of the trial transcript, where an unidentified witness, presumably a police officer, testified that when the witness spoke to Casasola, she was visibly shaken, so that the witness had to advise her to take a deep breath, and that "it's okay, we're here."

Discussion

Defendants' motion argued that plaintiff could not prevail on the merits because they were immune from suit under the The Annunzio-Wylie Anti-Money Laundering Act, and because plaintiff did not present prima facie proof of malicious prosecution.

1. *The Annunzio-Wylie Anti-Money Laundering Act, 31 United States Code section 5318(g)*

"Congress enacted the Annunzio-Wylie Anti-Money Laundering Act in order to facilitate cooperation between domestic financial institutions and the United States government to stop the global movement of drug money. Large criminal enterprises depend on their ability to conceal the proceeds of their criminal endeavors, and the Annunzio-Wylie Act seeks to make concealment much more difficult by encouraging financial institutions to disclose suspicious activity and cooperate with law enforcement efforts. But, because disclosure of financial information – either spontaneously or after a request from the government – could possibly lead to litigation with disgruntled customers . . . , the Annunzio-Wylie Act granted immunity to banks making disclosures." (*Coronado v. BankAtlantic Bancorp, Inc.* (11th Cir. 2000) 222 F.3d 1315, 1319; *Union Bank of California, N.A. v. Superior Court* (2005) 130 Cal.App.4th 378.)

---

[3] Defendants at times argue that plaintiff testified that at the Bank, he spoke of a "blast," but that is not the state of the evidence.

Thus, 31 United States Code section 5318(g) "Reporting of suspicious transactions" provides, under the heading "(3) Liability for disclosures": "Any financial institution that makes a voluntary disclosure of any possible violation of law or regulation to a government agency or makes a disclosure pursuant to this subsection or any other authority, and any director, officer, employee, or agent of such institution who makes, or requires another to make any such disclosure, shall not be liable to any person under any law or regulation of the United States, any constitution, law, or regulation of any State or political subdivision of any State, or under any contract or other legally enforceable agreement (including any arbitration agreement), for such disclosure or for any failure to provide notice of such disclosure to the person who is the subject of such disclosure or any other person identified in the disclosure."

Defendants do not contend that this case involves a suspicious transaction, or disclosure of financial information. Instead, their argument is that the Annunzio-Wylie Act (the Act) applies to a bank or bank employee's reports of any violation of law. In support, they cite cases which hold that the Act applies to disclosures of matters other than money laundering. However, the cited cases do not hold that the Act applies to situations like the one before us, which have nothing to do with banking transactions.

For instance, *Lopez v. First Union Nat'l Bank* (11th Cir. 1997) 129 F.3d 1186, held that a bank's disclosure of electronic fund transfers and information held in electronic storage was "not outside the scope" of the Act, and that "the three safe harbors provided by § 5318(g)(3) supply an affirmative defense to claims against a financial institution *for disclosing an individual's financial records or account-related activity.*" (*Id*. at p. 1191, italics added.)

*Stoutt v. Banco Popular de P.R.* (1st Cir. 2003) 320 F.3d 26, held that under the Act, a bank which informed the FBI of a suspicion that a borrower had engaged in a check-kiting scheme, a violation of federal bank fraud laws, was immune from tort liability. In *Nevin v. Citibank, N.A.* (S.D.N.Y. 2000) 107 F.Supp.2d 333, a department store security guard suspected that a customer was using a stolen credit card. He called the bank which issued the card, and the bank "authorized" the store to detain the customer

8

and said that the card might be stolen.  The store called police, who investigated by going to the customer's house.  She sued for slander, infliction of emotional distress, and other causes of action.  The bank claimed the protection of the Act, but the district court found that although the Act "encompasses the complete ambit of criminal behavior, *whether money laundering by international drug kingpins or credit card fraud at a shopping mall*," the bank was not immune, because the communication was between the bank and a private entity, the store.  (*Id*. at p. 341, italics added.)  *Coronado v. BankAtlantic Bancorp, Inc., supra,* 222 F.3d 1315, concerns a bank's compliance with facially valid grand jury subpoenas for customer records.

The immunity provisions of the Act must be viewed in the context of the Act and, no matter how broadly they apply to "disclosures" concerning financial transactions, they cannot be read to immunize any report to law enforcement, by any bank "director, officer, employee, or agent."  Indeed, the Supreme Court recently reiterated the principle that, "'[i]n all pre-emption cases, and particularly in those in which Congress has "legislated . . . in a field which the States have traditionally occupied," . . . we "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."' [Citations.]"  (*Wyeth v. Levine* (2009) 555 U.S. 555, 565.)  The Act contains no clear language manifesting an intention on the part of Congress to preempt California's malicious prosecution laws when a bank employee makes a false report to police in order to quiet an angry customer.


2. *Prima facie case for malicious prosecution*

Defendants first argue that plaintiff will not be able to prevail on the merits because he cannot prove that the action was commenced at their direction.  The relevant

9

law is clear:[4]  "One may be civilly liable for malicious prosecution without personally signing the complaint initiating the criminal proceeding."  (*Centers v. Dollar Markets* (1950) 99 Cal.App.2d 534, 544.)  "The test is whether the defendant was actively instrumental in causing the prosecution."  (*Sullivan v. County of Los Angeles* (1974) 12 Cal.3d 710, 720; 5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 476.)  "Cases dealing with actions for malicious prosecution against private persons require that the defendant has at least sought out the police or prosecutorial authorities and falsely reported facts to them indicating that plaintiff has committed a crime."  (*Sullivan v. County of Los Angeles, supra,* at p. 720.)

Defendants' argument is that California law does not hold a citizen responsible for initiating criminal proceedings unless he or she knowingly reported false facts to the police.  They argue that plaintiff has no evidence that Casasola knowingly lied.  In defendants' view, plaintiff's own declaration that he never made any threat, let alone a threat to blow up the Bank, is not enough to prove a likelihood of success, but merely creates a "he said, she said," situation which provides no basis for a finding that Casasola lied.

Defendants mistake the applicable legal standard.  In response to the special motion to strike, plaintiff presented his declaration that he never threatened to blow up the Bank, and on our review, we must "accept as true all evidence favorable to the plaintiff."  (*Overstock.com, Inc. v. Gradient Analytics, Inc., supra,* 151 Cal.App.4th at pp. 699-700.)  Thus, "he said" is a prima facie case, and in this case, he said that Casasola told police that he threatened to blow up the Bank, although he had made no such statement.  As defendants concede, they may be liable for malicious prosecution if Casasola knowingly made a false report to the police.

---

[4] Defendants are not assisted by their citation to a New York case which holds that """[t]he mere reporting of a crime to police and giving testimony are insufficient"' to show a defendant's initiation of a criminal proceeding.  [Citation.]"  (*Du Chateau v. Metro-North Commuter R.R. Co*. (N.Y. App. Div. 1999) 253 A.D.2d 128, 131 [688 N.Y.S.2d 12].)  Whatever the merits of that rule in New York, it is not a correct statement of California law.

10

Defendants also cite plaintiff's preliminary hearing testimony that he screamed, and argue that "Casasola could easily have misinterpreted [plaintiff's] outraged cries." The "could have," says it all. Defendants may seek to convince a jury that Casasola misheard plaintiff's statements, but a jury could also conclude from the evidence that Casasola deliberately lied, in order to induce police to make the call a priority, or to ensure that when they did arrive plaintiff would be arrested, because she disliked plaintiff for the way he behaved, or for another reason.

This is also our response to defendants' contention that plaintiff cannot prove malice, another element of malicious prosecution. (*Centers v. Dollar Markets, supra,* 99 Cal.App.2d at p. 539.) "For purposes of a malicious prosecution claim, malice 'is not limited to actual hostility or ill will toward the plaintiff. . . .' [Citation.]" (*Sycamore Ridge Apartments LLC v. Naumann* (2007) 157 Cal.App.4th 1385, 1407.) "[I]f the defendant had no substantial ground for believing in the plaintiff's guilt, but, nevertheless, instigated proceedings against the plaintiff, it is logical to infer that the defendant's motive was improper." (5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 485, p. 710.) At the special motion to strike, plaintiff presented evidence, through his own declaration, which would allow a jury to find that Casasola deliberately lied. That would establish malice.

Along the same lines, defendants argue that plaintiff cannot show lack of probable cause, another of the elements of malicious prosecution. "When, as here, the claim of malicious prosecution is based upon initiation of a criminal prosecution, the question of probable cause is whether it was objectively reasonable for the defendant . . . to suspect the plaintiff . . . had committed a crime." (*Ecker v. Raging Waters Group, Inc*. (2001) 87 Cal.App.4th 1320, 1330.) For purposes of a malicious prosecution action, "[p]robable cause does not depend upon the possession of facts which satisfactorily prove the guilt of an accused person. It has reference of the common standard of human judgment and conduct. It exists if one is possessed of information or facts which are sufficient to cause a reasonable person to honestly believe the charge is true [citation]." (*Northrup v. Baker* (1962) 202 Cal.App.2d 347, 354.)

11

"When the evidence bearing on the question of probable cause is in conflict, it is the province of the jury to determine whether facts exist which will warrant or reject an inference of probable cause." (*Centers v. Dollar Markets, supra,* 99 Cal.App.2d at p. 541.) As we have seen, there was a conflict of the evidence on whether Casasola honestly believed that plaintiff had threatened to blow up the Bank, or whether she deliberately lied. If she lied, she did not have probable cause.

Defendants argue, however, that the evidence that plaintiff raised his voice, said that he felt like kicking the cardboard display (in their view, this was a threat to destroy bank property), and in plaintiff's words "abused the peace of the Bank," means that they had grounds to suspect him of committing some crime, and that a defendant which has reasonable grounds for suspecting some crime[5] has probable cause, no matter what crime is reported.

They rely on two cases, *Ecker v. Raging Waters Group, Inc., supra,* 87 Cal.App.4th 1320, and *Roberts v. McAfee, Inc.* (9th Cir. 2011) 660 F.3d 1156.

In *Ecker v. Raging Waters, supra,* 87 Cal.App.4th 1320, the plaintiff was detained by security guards at an amusement park, after several adolescent boys complained that plaintiff was following and videotaping them. Security observed plaintiff, saw that he was surreptitiously videotaping juveniles and, once he was in the security office, looked at the tape in his camera and saw that the videotape consisted exclusively of shots of the bodies of adolescent boys. They contacted law enforcement. Plaintiff was taken into custody for the misdemeanor of annoying or molesting a child under the age of 18, charged with that offense, and acquitted after jury trial. He sued for malicious prosecution, but was nonsuited on the ground of probable cause. The appellate court affirmed, finding that given all the facts, "it was objectively reasonable to suspect that [plaintiff's] actions of following male juveniles and videotaping their bodies in a secretive

---

[5] Defendants do not specify the crime they had reason to suspect, but they are presumably referring to Penal Code section 415, commonly referred to as "disturbing the peace." We note, however, that plaintiff's testimony, in the criminal trial, that he "abused the peace of the Bank" is not an admission to a violation of Penal Code section 415.

manner –actions which clearly disturbed and upset the boys who had complained – were criminal." (*Id*. at p. 1331.)  Plaintiff's argument to the contrary relied on the security guard's testimony that he was not sure which park rule or which law had been violated. The court held that the fact that the guard "was uncertain of the precise crime [plaintiff] may have committed is irrelevant to the determination of probable cause.  The issue is whether it was objectively reasonable to suspect [plaintiff] had committed a crime.  It was.  Determination of the crime(s) to be charged is authority properly vested in a prosecuting agency, not a private amusement park . . . ."  (*Id*. at p. 1332.)

In *Roberts v. McAfee, Inc., supra,* 660 F.3d 1156, plaintiff was prosecuted for fraud, on allegations, which originated with his employer, concerning his participation in a stock option backdating scheme.  His malicious prosecution case included allegations that the employer had falsified and withheld evidence to make his culpability seem clearer than it really was.  The court held that the employer nonetheless had probable cause, noting that the employer "had probable cause to accuse [plaintiff] of participating in the illegal backdating of three stock option grants . . . regardless of whether [the employer] . . . or its agents misrepresented evidence to government investigators."  (*Id*. at p. 1164.)

We cannot see that either case holds that a defendant with – at best – some belief that a misdemeanor is being committed can make up evidence of an entirely different and much more serious crime.  We note in this regard that under the facts before us, a police officer responding to a disturbing the peace complaint would not have arrested plaintiff, who was manifestly not disturbing the peace when officers arrived.  (Pen. Code, § 836, subd. (a)(1).)

13

Disposition

The judgment in favor of Reyes is affirmed; the judgment in favor of the Bank and Casasola is reversed.  Appellant to recover costs on appeal.

**CERTIFIED FOR PUBLICATION**


ARMSTRONG, J.


We concur:


TURNER, P. J.


MOSK, J.