Filed 12/14/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SANFORD EDWARD,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DAVID ELLIS,<br><br>    Defendant and Appellant. | G059523<br><br>(Super. Ct. No. 30-2019-01052734)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Richard Y. Lee, Judge.  Affirmed.

Ballard Spahr, Robert S. Gutierrez and Elizabeth L. Schilken for Defendant and Appellant.

Bostwick Law, Gary L. Bostwick; Drooz Legal and Deborah Drooz for Plaintiff and Respondent.

\*        \*        \*

A political consultant designed two campaign mailers that were distributed to voters in a local city council election. The mailers included statements about a local real estate developer and his litigation history with the city and linked the developer to certain candidates. The developer sued the political consultant for libel based on allegedly false statements about him in the mailers, and the political consultant in turn filed a special motion to strike the complaint under the anti-SLAPP (strategic lawsuit against public participation) statute. (See Code Civ. Proc., § 425.16 (§ 425.16).)

The trial court denied the anti-SLAPP motion, finding that although the complaint arose from protected conduct, the developer demonstrated a probability of prevailing. We agree and therefore affirm the order denying the anti-SLAPP motion.

**FACTS**

The following facts are taken from the complaint, declarations, and other evidence submitted on the special motion to strike.

1. *Edward, Headlands, and the Beach Access Litigation*

Plaintiff Sanford Edward is a real estate developer and a managing member of Headlands Reserve, LLC (Headlands). Edward and Headlands are known in Dana Point (the City) for developing The Strand at Headlands (The Strand), an oceanfront community of multimillion dollar homes sited at one of the last undeveloped coastal promontories in Southern California.

In 2009, in accordance with a City ordinance, Headlands installed pedestrian gates at The Strand to limit public beach access through the development during certain hours. The installation of the gates spawned years of litigation against the City.

During the course of that beach access litigation, the City regularly submitted its bills for attorney fees to Headlands for reimbursement pursuant to

indemnity agreements between Headlands and the City.  In August 2015, however, Headlands stopped reimbursing the City for its legal fees.

2.    *The City's 2016 Complaint Against Edward for Fraud*

The City ultimately settled the beach access litigation in 2016 and then sued Headlands for $553,000 in unpaid legal fees.  It also asserted a claim for fraud against Edward individually.  Headlands cross-complained against the City, asserting the City had overbilled it by over $667,000.

The City, Headlands, and Edward settled the lawsuit in 2017, releasing all claims against one another.  As part of their written settlement agreement, under the heading "City Facility Donation," Headlands agreed to pay the City $248,200 to help renovate the City's community center.  According to Edward, Headlands agreed to this term as a "'good will' gesture," and the payment had nothing to do with resolving the City's claims against him or Headlands.  The settlement agreement did not require any other payments by either Headlands or Edward.

The settlement agreement also contained provisions about the City's fraud claim against Edward.  First, under the heading "City Retracts and Rescinds Fraud Allegations," the City agreed to "withdraw[ ] all allegations related to personal fraud, and Sanford Edward, as none exist.  As a result, the City hereby retracts and formally rescinds all such allegations and related claims."  Additionally, under the heading "Press Release," the parties agreed to issue a joint press release announcing the settlement, Headlands' donation for the community center, and the City's rescission and withdrawal of its fraud allegations against Edward.

The next month, the Orange County Register published an article reporting that the lawsuit between the City and Edward had come to an end.  The article reported Edward's $248,200 contribution for improvements to the community center, as well as the City's rescission of its fraud allegation against Edward.

3

### 3. *The 2018 City Council Election and the DPTA Mailers*

In 2018, the City held its first district-based city council elections. Three of the candidates—Joe Muller, Rick Viczorek, and Jamey Federico—received support from a political action committee, defendant Dana Point Taxpayers Association (DPTA). DPTA hired political consultant David Ellis to manage its campaign.

Ellis advised DPTA the best way to win was to run a negative campaign against the opposition. When doing his research for the campaign, Ellis read various articles and other documents in the public domain, including the Orange County Register's article about the 2017 settlement between Edward and the City. As a result, he came to believe Edward was a public figure. Ellis also concluded that Edward supported the opposing candidates—Joe Jaeger, Mark McGinn, and Charles Payne— after reading about a fundraiser Edward allegedly had thrown for them. Ellis never contacted Edward to ask whether he supported those candidates, nor did he contact the candidates themselves.

Ellis informed DPTA that Edward and Headlands supported Jaeger, McGinn, and Payne. According to DPTA's officer, that "seemed odd"; "it made no sense to us why [Edward, a developer,] would support the other candidates." Ellis seemed "credible," however, so DPTA believed him.

Ellis then designed two campaign mailers suggesting Edward supported and was able to control Jaeger, McGinn, and Payne.[1] The mailers, which DPTA approved and which are the subject of the present litigation, were sent to thousands of Dana Point residents in late October 2018.

The first mailer bore the heading, "THERE'S NO FREE LUNCH," and featured a photograph of candidate Charles Payne having lunch with "Headlands

---

[1] Copies of these mailers were attached to Ellis's declaration in support of his anti-SLAPP motion and are a part of the record. (See appendix, pp. 1-4.)

Developer Sanford Edward" and "Kingmaker Buck Hill"; the mailer invited voters to "MEET THE KINGMAKERS AND THE CANDIDATE," and stated in a caption that the three were "plotting to take over the city council." On the back was a screenshot of the caption from the City's 2016 complaint against Headlands and Edward, with the parties' names highlighted. Below was the following text: "Dana Point sued Headlands developer Sanford Edward for fraud, breach of contract, and not paying $553,000 in legal fees to the city." Beneath that, in bolded red text, it read: "Edward wants his money back. [¶] Electing city council candidate Charles Payne is his payday." Below that appeared a photograph of a fundraiser at a private club, with the text: "THEN EDWARD THREW A PRIVATE FUNDRAISER FOR HIS SLATE OF CANDIDATES[:] JOE JAEGER[,] CHARLES PAYNE[, and] MARK McGINN." The text went on: "*It was quite a shindig at the ultra-chic Headlands Strand Clubhouse.* [¶] Councilwoman Debra Lewis led the charge. [¶] Sanford Edward paid the bill. Taxpayers will pay in the end. [¶] STOP SLICK SANFORD FROM BUYING CITY HALL."

The second mailer read, "Meet the KINGMAKERS AND THE PUPPETS," and included the same photograph of Payne dining with Edward and Hill, but this time with crowns superimposed on the heads of Edward and Hill. The back of the mailer posed the question, "Will the Kingmakers Elect Their Puppets?," next to a picture of a hand holding puppet strings. Beneath were pictures of Jaeger (labeled "DISTRICT 1 PUPPET"), McGinn (labeled "DISTRICT 2 PUPPET"), and Payne (labeled "DISTRICT 3 PUPPET"), with captions either describing each as "part of the Sanford Edward slate" or asserting Lewis had "team[ed] up with Headlands developer Sanford Edward" to elect those candidates. Below that appeared the same highlighted screenshot of the caption from the City's 2016 complaint against Headlands and Edward, plus additional highlighted screenshots of excerpts from the complaint, which alleged, "Dana Point is bringing a further claim against Sanford Edward ('Edward') for fraud," and "Defendant Headlands breached this contract by failing to pay for required legal

5

services, beginning in August 2015 and totaling $553,754 (with additional amounts continuing to be incurred)." Underneath those images was the statement, "Dana Point sued Headlands developer Sanford Edward for fraud, breach of contract, and not paying $553,000 in legal fees to the city," followed by bolded red text that read, "Edward wants his money back. Electing city council candidates Joe Jaeger, Mark McGinn and Charles Payne is his payday. [¶] STOP Developer Slate: Jaeger – McGinn – Payne."

4.    *Edward's Libel Claim Against DPTA and Ellis*

Edward believed DPTA's mailers falsely insinuated he was found liable to the City for fraud in the City's 2016 lawsuit over attorney fees from the beach access litigation; he also believed the mailers falsely represented that he supported and fundraised for certain candidates, when in fact he did not support, endorse, or donate to any candidate in the 2018 election. Accordingly, just days after the mailers were disseminated, Edward's lawyer sent a cease-and-desist letter to DPTA. In a further exchange of letters between counsel, Edward threatened to sue DPTA unless it published a retraction; DPTA denied any wrongdoing and asserted Edward's complaint would be subject to an anti-SLAPP motion.

DPTA did not retract the statements in its mailers. Instead, in February 2019, it published a paid advertisement in the Dana Point Times "to clear up any confusion that may have resulted." The advertisement maintained the mailers were "factually accurate," but clarified the City's 2016 action against Headlands and Edward ended in "an out-of-court settlement, in which Mr. Edward agreed to pay nearly $250,000 to the City of Dana Point" for use in "improv[ing] the City of Dana Point's community and senior center."

Unsatisfied with this clarification, Edward filed a complaint against DPTA, asserting a single cause of action for libel per se based on DPTA's distribution of the mailers. According to Edward's complaint, the mailers are defamatory because "they convey the false message that Edward was found liable for fraud and other unlawful acts

6

against the City, and paid hundreds of thousands of dollars in damages in satisfaction of a judgment rendered against him in a case filed by the City . . . . In fact, [t]he City dismissed the Case, rescinded the fraud claim and publicly conceded that it was a 'mistake' in a formal settlement agreement at least eighteen months before the Mailers were published."

DPTA filed an anti-SLAPP motion, which the trial court denied. Among other things, the court found Edward had demonstrated a probability of prevailing on his defamation claim, noting the mailers could be reasonably read as falsely implying Edward had been found liable for fraud and paid fraud damages. The court further found Edward was a limited purpose public figure and thus had to prove actual malice, and he had demonstrated a probability of proving Ellis knew of or recklessly disregarded the falsity of the implication that Edward had been adjudged liable for fraud. DPTA did not appeal that ruling.

Edward amended his complaint to substitute in Ellis as a Doe defendant, and Ellis responded with his own anti-SLAPP motion. The trial court denied Ellis's motion, adopting a similar line of reasoning as in its earlier order. Ellis appeals that order.

## DISCUSSION

1. *The Anti-SLAPP Statute*

The Legislature enacted the anti-SLAPP statute to address "what are commonly known as SLAPP suits (strategic lawsuits against public participation)—litigation of a harassing nature, brought to challenge the exercise of protected free speech rights." (*Fahlen v. Sutter Central Valley Hospitals* (2014) 58 Cal.4th 655, 665, fn. 3.) The statute authorizes a special motion to strike meritless claims early in the litigation if the claims "aris[e] from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution

7

in connection with a public issue." (§ 425.16, subd. (b)(1).) The statute is "'intended to resolve quickly and relatively inexpensively meritless lawsuits that threaten free speech on matters of public interest.'" (*Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 619.)

When evaluating a special motion to strike, the trial court must engage in a two-step process. "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. . . . [Citation.] If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim." (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67.) "Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89 (*Navellier*).) We review a trial court's order denying an anti-SLAPP motion de novo. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 325.)

2.    *Step One:  Protected Activity*

Under step one of the anti-SLAPP analysis, we must first decide whether Ellis made a threshold showing that Edward's claims arose from an act in furtherance of Ellis's right of petition or free speech in connection with a public issue. (§ 425.16, subd. (b)(1); see *id.*, subd. (e) [defining protected activity].) Edward does not dispute that the complaint arises from protected activity, and rightly so. The distribution of campaign mailers and other political literature about candidates' qualifications is undoubtedly protected activity under the anti-SLAPP statute. (See, e.g., *Major v. Silna* (2005) 134 Cal.App.4th 1485, 1490; *Beilenson, supra,* 44 Cal.App.4th at pp. 949-950.)

3.    *Step Two:  Probability of Prevailing*

We therefore turn to step two of the anti-SLAPP analysis, in which Edward must demonstrate a probability of prevailing against Ellis. His "'burden of establishing a

probability of prevailing is not high: We do not weigh credibility, nor do we evaluate the weight of the evidence. Instead, we accept as true all evidence favorable to the plaintiff and assess the defendant's evidence only to determine if it defeats the plaintiff's submission as a matter of law. [Citation.] Only a cause of action that lacks "even minimal merit" constitutes a SLAPP. [Citation.]' [Citation.] 'Put another way, the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited."'" (*Greene v. Bank of America* (2013) 216 Cal.App.4th 454, 458, fn. omitted (*Greene*).)

As noted, Edward's complaint asserts a single cause of action against Ellis for libel per se. Libel is the publication of an unprivileged written communication about the plaintiff that is false, defamatory, and has a natural tendency to injure. (Civ. Code, §§ 44, 45; *Jackson v. Mayweather* (2017) 10 Cal.App.5th 1240, 1259-1260.) Libel per se is when the communication is defamatory without the need for explanatory matter. (Civ. Code, § 45a.) Where, as here, the plaintiff is a limited public figure,[2] he must prove both that the challenged statement is false, and that the defendant made the libelous statement with "'actual malice.'" (*Balla v. Hall* (2021) 59 Cal.App.5th 652, 675 (*Balla*).)

a. *Falsity*

Ellis first contends Edward failed to show a probability of prevailing on the merits because the mailers did not include any falsities, express or implied. We disagree.

Unlike mere opinions, a statement that suggests or implies a false assertion of fact is actionable. (*Balla, supra,* 59 Cal.App.5th at p. 677; *Issa v. Applegate* (2019) 31 Cal.App.5th 689, 702 (*Issa*).) The "dispositive question" in such a case is "whether a reasonable fact finder could conclude the published statement declares or implies a

---

[2] Edward does not dispute he is a limited public figure for purposes of this case.

provably false assertion of fact." (*Franklin v. Dynamic Details, Inc.* (2004) 116 Cal.App.4th 375, 385 (*Franklin*).)  This is ordinarily a question of law for the court, "unless the statement is susceptible of both an innocent and a libelous meaning, in which case the jury must decide how the statement was understood." (*Ibid.*)

In determining whether the disputed statement communicates or implies a provably false assertion of fact, we look at the totality of the circumstances, looking first to the language of the statement and whether it was understood in a defamatory sense, and then considering the context in which the statement was made. (*Franklin, supra,* 116 Cal.App.4th at p. 385.)  We focus not on the literal truth or falsity of each word in a statement, but rather on """whether the 'gist or sting' of the statement is true or false, benign or defamatory, in substance.""" (*Balla, supra,* 59 Cal.App.5th at pp. 677-678; *Issa, supra,* 31 Cal.App.5th at p. 702; see, e.g., *Overstock.com, Inc. v. Gradient Analytics, Inc.* (2007) 151 Cal.App.4th 688, 704 [stylistic emphasis on key phrases supported finding that the publications could be understood as implying false assertions of fact].)  We also consider "whether the reasonable or 'average' reader would so interpret the material.  [Citations.]  The 'average reader' is a reasonable member of the audience to which the material was originally addressed." (*Couch v. San Juan Unified School Dist.* (1995) 33 Cal.App.4th 1491, 1500.)

Applying those standards to this record, we conclude the mailers in question could reasonably be understood by an average Dana Point voter to imply that Edward was found liable for fraud and paid money damages to the City as a result.  Both mailers included a highlighted screenshot of the caption from the City's 2016 complaint against Edward for fraud; below that, both mailers declared that the City sued Edward for fraud, breach of contract, and not paying $553,000 in legal fees; and immediately below that, both mailers asserted in bolded red letters that "Edward wants his money back." Read together and in context, the apparent implication from these statements is that Edward was found liable and had to pay damages on the City's claims, including its fraud

10

claim, and he now wants to recover that money. Indeed, the mailers suggest no other possibility as to why Edward "wants his money back."

That brings us to whether that insinuation was provably false. We conclude it was, as it is undisputed that Edward paid nothing to the City on its fraud cause of action. The 2017 settlement agreement did require Edward to make a $248,200 "[d]onation" for the renovation of a community center, but that payment was not made on the fraud claim; to the contrary, the City expressly withdrew, retracted, and rescinded all "allegations related to personal fraud, and Sanford Edward," as part of the settlement.

Of course, that is not the only possible reading of the mailers. We recognize an average reader might reach some other conclusion.[3] But if the statements contained in the mailers are susceptible of both an innocent and libelous meaning, it is for the jury, not us, to decide how they were in fact understood. (*Franklin, supra,* 116 Cal.App.4th at p. 385; see also *Okun v. Superior Court* (1981) 29 Cal.3d 442, 450 ["a writing's susceptibility to innocent meaning does not in itself preclude a finding that an ordinary reader would understand it in a libelous sense"].)

Ellis argued in his briefing and at oral argument that the "Edward wants his money back" statement is too generalized to support any particular conclusion and is instead "classic rhetorical hyperbole" typical of political debate. (See *Grenier v. Taylor* (2015) 234 Cal.App.4th 471, 486 ["rhetorical hyperbole, vigorous epithets, lusty and imaginative expressions of contempt and language used in a loose, figurative sense will not support a defamation action"].) We are not persuaded. Rhetorical hyperbole is language that is so loose, figurative, or hyperbolic that it negates any impression that the writer was seriously maintaining a factual proposition susceptible of being proved true or

---

[3] At oral argument we invited counsel for Ellis to provide us with some alternative innocent inference that might be drawn from this language. He was unable to do so.

11

false.  (*Hoang v. Tran* (2021) 60 Cal.App.5th 513, 534; see, e.g., *Ferlauto v. Hamsher* (1999) 74 Cal.App.4th 1394, 1403-1404 [book's flip characterizations of opponent's lawyer as "Kmart Johnnie Cochran," "creepazoid attorney," and "loser wannabe lawyer" were classic rhetorical hyperbole that could not be interpreted as stating actual facts]; *Beilenson v. Superior Court* (1996) 44 Cal.App.4th 944, 951 (*Beilenson*) [defendant's statement in political campaign that plaintiff's conduct was a "'rip-off,'" taken in context with rest of mailer, was rhetorical hyperbole].)

Here, the phrase "Edward wants his money back" appears immediately below actual screenshots and a factual description of the City's 2016 complaint against Edward.  Indeed, Ellis testified he used the screenshots of the complaint's caption "to generate [a sense of] authenticity and validity."  The juxtaposition and proximity of the phrase "Edward wants his money back" to those screenshots and factual description suggests the "money back" statement was intended to be factual in nature, not political hyperbole.

Other parts of the mailers do employ rhetorical language—e.g., the mailers refer to Edward as a "[k]ingmaker[]" and urge voters to "STOP SLICK SANFORD FROM BUYING CITY HALL."  But the phrase "Edward wants his money back" appears *immediately* next to *factual* assertions about the City's 2016 lawsuit.  A reasonable reader might well conclude that the "Edward wants his money back" line was also factual in nature.

We are mindful that, particularly in the political context, "we 'must be vigilant to afford a wide berth to the free exchange of ideas, including those that challenge or criticize statements made or actions taken by candidates seeking elected office.' [Citations.]  [¶]  But characterizing speech as 'political' does not automatically or entirely exempt it from liability for defamation." (*Balla, supra,* 59 Cal.App.5th at p. 680.)  "'[E]ven as to public officials, knowingly false statements of fact are

12

constitutionally unprotected.'" (*Ibid.*) On this record, we conclude the mailers are reasonably susceptible of an interpretation that implies a provably false assertion of fact.

b.    *Actual Malice*

Ellis next asserts Edward's libel claim should be dismissed because Edward did not establish a probability of producing clear and convincing evidence of actual malice. We again disagree.

As noted above, a libel plaintiff who is a public figure must prove, by clear and convincing evidence, that the defendant made the libelous statement with "'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." (*New York Times Company v. Sullivan* (1964) 376 U.S. 254, 279-280 (*New York Times*); see *Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 256-257.) Although at trial a public figure plaintiff must establish actual malice by clear and convincing evidence, in the context of an anti-SLAPP motion the plaintiff must instead establish only a "probability" that he or she can produce clear and convincing evidence of actual malice. (*Ampex Corp. v. Cargle* (2005) 128 Cal.App.4th 1569, 1578 (*Ampex*).)

"'[A]ctual malice can be proved by circumstantial evidence.' [Citation.] Considerations such as 'anger and hostility toward the plaintiff,' 'reliance upon sources known to be unreliable [citations] or known to be biased against the plaintiff,' and 'failure to investigate' may, 'in an appropriate case, indicate that the publisher himself had serious doubts regarding the truth of his publication.' [Citation.] Such evidence is relevant 'to the extent that it reflects on the subjective attitude of the publisher.'" (*Balla, supra,* 59 Cal.App.5th at p. 683.) However, "failure to investigate, without more, generally is insufficient" to show malice. (*Ibid.*) And "we will not infer actual malice solely from evidence of ill will, personal spite or bad motive." (*Ampex, supra,* 128 Cal.App.4th at p. 1579.)

In both his anti-SLAPP motion and now on appeal, Ellis insists he never intended to convey that Edward was found liable for fraud and paid damages to the City when he used the phrase "Edward wants his money back." According to Ellis, he cannot be held liable for a falsity he never meant to convey. (See *De Havilland v. FX Networks, LLC* (2018) 21 Cal.App.5th 845, 869-870 [in cases of defamation by implication, public figure plaintiff must prove the defendant intended the defamatory impression, and not just unknowingly misled the public]; *Dodds v. American Broadcasting Co.* (9th Cir. 1998) 145 F.3d 1053, 1064 [same].)

The record raises credibility questions about Ellis's professions of innocence. First, there are Ellis's own explanations for what he intended to convey with the phrase "Edward wants his money back." When specifically asked at deposition what he had in mind when he used that phrase, Ellis repeatedly claimed he could not recall.[4] In the absence of a meaningful explanation for his word choice, Ellis gives us no reason to believe he accidently or unknowingly misled the public when he falsely insinuated Edward had paid damages for fraud.

Second, and more importantly, Ellis expressly admitted both at deposition and in his subsequent written declaration that as part of his prepublication research for the mailers, he read the Orange County Register's article about the 2017 settlement between Edward and the City, including (1) the section describing the City's agreement to "rescind" its fraud claim against Edward and (2) the section mentioning Edward's

---

[4] Ellis answered, "I don't recall," "I don't remember," or "I don't know" over 100 times during his three-hour deposition. When asked whether the phrase "Edward wants his money back" could be understood to mean Edward paid money to the City after being sued for fraud, Ellis testified, "I don't know what it could be interpreted to mean. I don't interpret." When asked what he intended it to say, Ellis answered, "I didn't intend it to – it's just a phrase." The trial court observed that Ellis's deposition testimony was "very vague, disjointed, and peculiar." Among other things, the court's order noted Ellis could not articulate a reason why he chose to run a negative campaign, nor could he explain why the mailers targeted Edward.

14

$248,000 contribution for the community center. These admissions are critical to our analysis as they demonstrate beyond any point of dispute that Ellis *knew* long before distribution of the contested mailers that Edward did not pay damages to the City for fraud, yet he went ahead with the publication of mailers that insinuated the very opposite. As a result, Ellis arguably acted "with 'actual malice'—that is, with knowledge that [the statements were] false." (See *New York Times, supra,* 376 U.S. at pp. 279-280.)

For these reasons, we conclude Edward "establish[ed] a probability that [he] can produce clear and convincing evidence that the allegedly defamatory statements were made with knowledge of their falsity . . . ." (See *Ampex, supra,* 128 Cal.App.4th at p. 1578.)

We reiterate that for purposes of our anti-SLAPP analysis, Edward's burden on prong two is "not high," and we are required to "accept as true all evidence favorable to" Edward. (*Greene, supra,* 216 Cal.App.4th at p. 458.) Under that low standard, Edward met his burden of showing his libel claim against Ellis has "minimal merit." (See *Navellier, supra*, 29 Cal.4th at p. 89 [only a cause of action that "lacks even minimal merit" is " subject to being stricken under the statute"].) The actual merits of Edward's claim must be resolved by the trier of fact.[5]

---

[5] In light of our decision to affirm the denial of Ellis's anti-SLAPP motion, we need not reach Edward's evidentiary objections to material cited in Ellis's opening brief; for the same reason, Edward's request for judicial notice is denied.

15

## DISPOSITION

The order denying Ellis's anti-SLAPP motion is affirmed.  Edward shall recover his costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1).)


GOETHALS, J.

I CONCUR:


MARKS, J.*


\* Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

16

FYBEL, J., concurring:

I respectfully concur in the majority opinion. I write separately to express my firmly held belief that open discussion and robust debate are the best means of exposing lies and errors in public speech. Nearly 100 years ago, Justice Brandeis said, in *Whitney v. California* (1927) 274 U.S. 357, 377 (conc. opn. of Brandeis, J.), "If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence." These words are more relevant now than they have ever been.

More than a decade ago, I expressed my views on this subject in my dissent in *Overhill Farms, Inc. v. Lopez* (2010) 190 Cal.App.4th 1248. In that case, a number of employees of the plaintiff, a publicly traded company that manufactured frozen food, participated in protests outside of the plaintiff's two plants and the place of business of one of plaintiff's customers. (*Id.* at pp. 1251, 1253.) The employees carried signs and handed out leaflets and flyers declaring the plaintiff to be "'unfair'" and "'racist'" due to layoffs it had made in response to an IRS audit. (*Id.* at p. 1255.) The plaintiff sued the employees for defamation and a host of other torts with the primary goal of enjoining further protests. (*Id.* at p. 1252.)

The trial court denied the employees' anti-SLAPP motion to strike, and the majority opinion affirmed. (*Overhill Farms, Inc. v. Lopez, supra*, 190 Cal.App.4th at p. 1252.) I dissented because I believed the plaintiff had failed to produce evidence showing the employees had made any provably false assertion of fact. (*Id.* at pp. 1273, 1274-1277 (dis. opn. of Fybel, J.).) The plaintiff had the ability and means to issue its own press release, distribute its own leaflets, and otherwise present its own side of the story in a public forum. (*Id.* at pp. 1273, 1278 (dis. opn. of Fybel, J.) The lawsuit, by which the plaintiff primarily sought an injunction to prohibit future speech, was an attempt to "curb and chill employee protests." (*Id.* at p. 1273 (dis. opn. of Fybel, J.)

1

Justice Brandeis's advice was particularly apt: More speech, not less, was the proper remedy.

In the present case, although I agree with the majority that the assertion "Edward wants his money back" implies a provably false assertion of fact, I believe this is a close call. The flyer stated that the City of Dana Point (the City) had sued Edward for $553,000 in unpaid legal fees. Immediately below that statement was the sentence, "Edward wants his money back." The content, context, and placement of these two statements are sufficient to imply a provably false assertion of fact: Edward paid the City $533,000, and he will get that money back if "his" slate of candidates is elected.

I hasten to add that Ellis has a plausible argument that the statement "Edward wants his money back" is not a provably false fact. Indeed, the majority opinion acknowledges that Ellis's statements are susceptible of an innocent meaning. (Maj. opn., *ante*, at p. 11.) Thus, Ellis might eventually prevail. But at the second step of the anti-SLAPP analysis, Edward's burden was "'not high.'" (*Greene v. Bank of America* (2013) 216 Cal.App.4th 454, 458.) He had to show only that his claim of malice has the requisite "minimal merit" (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89). Given this low threshold, Ellis's argument does not carry the day at this stage.

I also agree that Edward has produced evidence establishing a probability of prevailing on his claim of actual malice. Under *New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 285-286, an inference of actual malice may be drawn from circumstantial evidence that a statement was made with knowledge of its falsity or with reckless disregard for its truth. Thus, evidence that Ellis knew before the flyers were published that Edward had not paid damages to the City is enough to meet his low burden of establishing his claim has the requisite minimal merit. (*Navellier v. Sletten, supra*, 29 Cal.4th at p. 89.)

I concur in the result in this case because Edward's burden on the second step of the anti-SLAPP analysis is only to show that his claim has the requisite minimal

2

merit.  (*Navellier v. Sletten, supra,* 29 Cal.4th at p. 89.)  For the reasons I have explained, this burden has been met, but only because it is so low.

Finally, it would have been much more consistent with our cherished and robust First Amendment values for Edward to have responded to the assertions in the flyer by engaging in public speech rather than filing a lawsuit.  Edward, like the plaintiff employer in *Overhill Farms*, had the ability and means to issue his own flyer or press release or otherwise tell his side of the story in a public forum.

If the flyers told lies, Edward could counter them with the truth.  As Justice Kennedy stated, in an opinion joined in by Chief Justice Roberts and Justices Ginsburg and Sotomayor and concurred in by Justices Breyer and Kagan:  "The remedy for speech that is false is speech that is true.  This is the ordinary course in a free society.  The response to the unreasoned is the rational; to the uninformed, the enlightened; to the straight-out lie, the simple truth."  (*United States v. Alvarez* (2012) 567 U.S. 709, 727.)


FYBEL, ACTING P. J.

34145 Pacific Coast Hwy. #701
Dana Point, CA 92626



PRESORT STD
U.S. POSTAGE
**PAID**
BC





| | |
|---|---|
| CITY OF DANA POINT, | CASE NO: 30-2016-00872051-CU-BC-CJC |
| Plaintiff, | JUDGE: Judge Theodore Howard<br>DEPT: |
| vs. | COMPLAINT FOR DAMAGES |
| Headlands Reserve, LLC, Sanford Edward, an individual, and DOES 1 to 50, inclusive, | Complaint Filed: |
| Defendants. | |

**Dana Point sued Headlands developer Sanford Edward for fraud, breach of contract, and not paying $553,000 in legal fees to the city.**

**Edward wants his money back.**

**Electing city council candidate Charles Payne is his payday.**



**THEN EDWARD THREW A PRIVATE FUNDRAISER FOR HIS SLATE OF CANDIDATES**

**JOE JAEGER**
**CHARLES PAYNE**
**MARK McGINN**

*It was quite a shindig at the ultra-chic Headlands Strand Clubhouse.*

**Councilwoman Debra Lewis led the charge.**
**Sanford Edward paid the bill.**
**Taxpayers will pay in the end.**



**STOP SLICK SANFORD FROM BUYING CITY HALL**

Paid for by Dana Point Taxpayers Association
Not authorized by any candidate or any committee controlled by a candidate.

554

2

34145 Pacific Coast Hwy. #701
Dana Point, CA 92626

PRESORT STD
U.S. POSTAGE
**PAID**
BC




556

3

# Will the Kingmakers Elect Their Puppets?



**DISTRICT 1 PUPPET**

Councilwoman Debra Lewis teaming up with Headlands developer Sanford Edward to elect **Joe Jaeger** in District 1

**DISTRICT 2 PUPPET**

2nd District candidate **Mark McGinn** is part of the Sanford Edward slate

**DISTRICT 3 PUPPET**

Councilwoman Debra Lewis teaming teaming up with Headlands developer Sanford Edward to elect **Charles Payne** in District 3

CITY OF DANA POINT,

Plaintiff,

vs.

Headlands Reserve, LLC, Sanford Edward, an individual, and DOES 1 to 50, inclusive,

Defendants.

CASE NO: 30-2016-00872051-CU-BC-CJC

JUDGE: Judge Theodore Howard
DEPT:

**COMPLAINT FOR DAMAGES**

Complaint Filed:

the Headlands development project. Dana Point is bringing a further claim against Sanford Edward ("Edward") for fraud. This claim is based on several verbal promises made by Edward,

42. Defendant Headlands breached this contract by failing to pay for required legal services, beginning in August 2015 and totaling $553,754 (with additional amounts continuing to be incurred).

**Dana Point sued Headlands developer Sanford Edward for fraud, breach of contract, and not paying $553,000 in legal fees to the city.**

## Edward wants his money back.

**Electing city council candidates Joe Jaeger, Mark McGinn and Charles Payne is his payday.**



**Developer Slate: Jaeger – McGinn – Payne**

Paid for by Dana Point Taxpayers Association
Not authorized by any candidate or any committee controlled by a candidate.

557