Filed 3/16/23  Orcutt v. MacDonald CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| RICHARD ORCUTT,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>JOHN A. MACDONALD,<br><br>Defendant and Respondent. | 2d Civil No. B319016<br>(Super. Ct. Nos. 20CV-0656,<br>20CV-0658, 20CV-0662, 21CV-<br>0030, 21CV-0052)<br>(San Luis Obispo County) |

Richard Orcutt appeals from the judgment after the trial court granted John A. MacDonald's motion to strike the complaint pursuant to the anti-SLAPP (strategic lawsuit against public participation) statute (Code Civ. Proc., § 425.16).[1]  Orcutt contends the trial court erred in granting the anti-SLAPP motion because he established a probability of prevailing on his malicious prosecution claim.  We affirm.

---

[1] Undesignated statutory references are to the Code of Civil Procedure.

## FACTUAL AND PROCEDURAL HISTORY

On May 30, 2019, G.C. reported to San Luis Obispo Police Officer Jake Pelletier that she received an anonymous card in the mail regarding property she managed on Cavalier Lane. The card said to not rent the property "to Chinese or Mexican [*sic*]. They have ruined our neighborhood. You or your renters will be shot if you do." The note complained about tenants at other addresses on Cavalier, including a claim that "Mexicans have turned [one residence] into a used car lot."

Also on May 30, Officer Pelletier received a complaint from C.S. about a similar anonymous card he received regarding a property he managed on Cavalier. It said to not rent to "Chinese Filipino or Mexicans," and contained the same threat that the manager or renters would be shot. It mentioned several addresses on Cavalier and claimed one tenant was "a convicted felon." Both cards listed the return address as only "Cavalier neighbors."

"Nearly immediately" after reading the card received by G.C., Officer Pelletier recalled emails he recently received signed "Richard V. Orcutt," who lived on Cavalier. The emails referenced some of the same addresses on Cavalier contained in the anonymous notes to G.C. and C.S. The emails complained that a Hispanic male was living in an SUV parked outside two residences on Cavalier. One email stated, "my bet is he's a Felon." Pelletier discussed the emails with Orcutt in April 2019.

Detective Evan Stradley was assigned to investigate the anonymous cards. Orcutt was the only suspect. Stradley interviewed several neighbors who described negative comments Orcutt made about racial and ethnic minorities.

On June 28, after conducting "a significant amount of investigation and multiple interviews," Stradley contacted

MacDonald.  MacDonald was a captain at the fire department. Orcutt had been a firefighter at the department, and they worked together from about 2000 to 2011.  They sometimes worked different shifts or at different stations.

Stradley showed MacDonald the threatening cards. MacDonald told Stradley that based on the way Orcutt wrote the letters Y and U, and the "writing style and verbiage," he "believed with confidence that [Orcutt] had written" the cards.

Later on June 28, a judge signed a search warrant for Orcutt's home.  An arrest warrant was issued the next day.  The ensuing search found no incriminating evidence.

On June 29, MacDonald phoned Sergeant Chad Pfarr because they had both worked for the city for nearly 20 years. MacDonald said he "believed he knew who authored the threatening letter" to C.S. because Orcutt "had a unique 'U' and 'Y' which he believed were similar to the 'U's' and 'Y's' made by the author of the threatening letter."  But based on his fear of Orcutt, MacDonald said he did not want to testify or be identified in any reports.

Stradley then spoke to MacDonald on the phone. MacDonald estimated seeing Orcutt's handwriting approximately 30 times.  MacDonald said he did not have "[p]roof," but he believed Orcutt wrote the threatening notes "based on how the letter, 'Y,' was written, the contents of the letter and due to knowing that [Orcutt] lives on Cavalier."  He said he was afraid of Orcutt based on an incident at the fire station in which Orcutt had "[f]reaked out."  MacDonald said he was afraid to be exposed as a witness in the case, and "wanted to make sure that this investigation was not solely based on his statements." MacDonald told detectives he did not want to testify in court or have anything further to do with the case.

3

Several weeks later, Pfarr contacted MacDonald at the fire station. MacDonald said "he wished he had never provided information about the case" and would not cooperate further. He requested that police review Orcutt's personnel file to find other witnesses regarding his writing style or to identify him as the author of the notes.

The district attorney charged Orcutt with making criminal threats. MacDonald did not wish to be a witness but testified reluctantly at the preliminary examination pursuant to a subpoena. He testified that while on a trip to New York City, he received a call from a police officer. The officer told MacDonald he would be a confidential witness, and, without saying the call was being recorded, asked MacDonald questions about the case. MacDonald believed it "was a discussion between friends, between an officer who I know personally and grew up in the fire and police service together. I had no idea that I'd be sitting here today."

On cross-examination, defense counsel asked MacDonald, "You don't like Mr. Orcutt, do you?" MacDonald responded, "I'm not fond of him as a person." Stradley testified that MacDonald's identification was "the only direction connection" between Orcutt and the cards.

At the conclusion of the preliminary hearing, the prosecutor stated that an FBI expert compared the cards with writing found in Orcutt's home and conducted DNA and fingerprint analyses, and Google searched Orcutt's computer and cell phone. None of these techniques yielded any evidence to corroborate Orcutt as the author of the notes. Of the three FBI handwriting comparisons, two were "inconclusive" and the third "may not have" been Orcutt. The magistrate granted the prosecution's motion to dismiss the criminal case. The

4

magistrate stated that while there was probable cause to search Orcutt's home, it was "undercut" by the subsequent investigation.

Orcutt sued MacDonald for malicious prosecution. He also alleged, but later abandoned, causes of action for intentional infliction of emotional distress and defamation.

MacDonald filed a motion to strike the complaint pursuant to section 425.16. Stradley's declaration in support of the motion stated, "At no time did Captain MacDonald advocate for the arrest or prosecution of [Orcutt], and he indicated that he preferred not to be involved at all."

The trial court granted the anti-SLAPP motion and entered judgment striking the complaint. Orcutt appeals that ruling. (§ 904.1, subd. (a)(13).)

## DISCUSSION

### *Anti-SLAPP motion*

The anti-SLAPP statute serves "the public interest to encourage continued participation in matters of public significance." (§ 425.16, subd. (a).) "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech . . . in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) The court "engage[s] in a two-step process: 'First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. . . . If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim.' " (*Taus v. Loftus* (2007) 40 Cal.4th 683, 712.)

Orcutt concedes that MacDonald's statements to law

5

enforcement constituted protected activity. But Orcutt contends he satisfied the second prong by establishing a probability of prevailing on his malicious prosecution claim. We review that issue de novo. (*Greka Integrated, Inc. v. Lowrey* (2005) 133 Cal.App.4th 1572, 1577.)

" 'In order to establish a probability of prevailing on the claim . . . the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." [Citations.]' " (*Taus v. Loftus*, *supra*, 40 Cal.4th at pp. 713-714.) The plaintiff is "required to produce admissible evidence from which a trier of fact could find in his favor, as to *every element*" of malicious prosecution. (*Lee v. Kim* (2019) 41 Cal.App.5th 705, 721.) Although " 'the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim. [Citation.]' " (*Taus,* at p. 714.)

Only "claims with the requisite minimal merit may proceed." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 94.) "This burden is somewhat akin to that required to resist a nonsuit [citation], or to move for summary judgment." (*1-800 Contacts, Inc. v. Steinberg* (2003) 107 Cal.App.4th 568, 584.) But unlike summary judgment, "[t]he defendant's only burden is to establish that claims against it fall within the ambit of the statute, and the defendant does not have the overall burden of showing the plaintiff cannot prevail on the claims." (*Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, 675, fn. 10.)

*Malicious prosecution*

"Malicious prosecution 'consists of initiating or procuring the arrest and prosecution of another under *lawful process*, but from *malicious motives* and *without probable cause. . . .* The test is whether the defendant was *actively instrumental* in causing the prosecution.' [Citation.] Cases dealing with actions for malicious prosecution against private persons require that the defendant has at least sought out the police or prosecutorial authorities and falsely reported facts to them indicating that plaintiff has committed a crime. [Citations.]" (*Sullivan v. County of Los Angeles* (1974) 12 Cal.3d 710, 720, fourth italics added (*Sullivan*).)

"[I]n order to establish a cause of action for malicious prosecution of either a criminal or civil proceeding, a plaintiff must demonstrate 'that the prior action (1) was commenced by or at the direction of the defendant and was pursued to a legal termination in his, plaintiff's, favor [citations]; (2) was brought without probable cause [citations]; and (3) was initiated with malice [citations].' " (*Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 871.) The parties do not dispute that the criminal prosecution was terminated in Orcutt's favor.

*Initiation of prosecution*

Providing statements to investigators does not constitute malicious prosecution where the witness does not "instigate" and is not " 'actively instrumental in causing' " the prosecution. (*Cedars-Sinai Medical Center v. Superior Court* (1988) 206 Cal.App.3d 414, 417 (*Cedars-Sinai*).) In *Cedars-Sinai*, the defendants "were approached by the authorities as potential witnesses in an investigation which had already focused on" the suspect. They identified the suspect's voice in a recorded bomb threat and testified at the preliminary hearing. (*Id.* at pp. 418,

416.)  The court held that the defendants were entitled to summary judgment in the civil action for malicious prosecution because they did not "initiate[] the prosecution." (*Id*. at p. 417.)

*Cedars-Sinai* was followed in *Zucchet v. Galardi* (2014) 229 Cal.App.4th 1466 (*Zucchet*).  Zucchet sued Galardi for allegedly making false statements to prosecutors about providing money to bribe Zucchet, and for giving allegedly false testimony about the bribe during the criminal trial.  (*Id*. at p. 1475.)  The court ruled that the anti-SLAPP motion should have been granted because "merely giving testimony and responding to law enforcement inquiries in an active criminal proceeding does not constitute malicious prosecution." (*Id*. at p. 1482.)  "[T]o create liability for malicious prosecution it is not enough to provide information to authorities during an ongoing criminal investigation.  The person must 'take some affirmative action to encourage the prosecution by way of advice or pressure, as opposed to merely providing information.' " (*Id*. at p. 1485.)

Following the lead of our Supreme Court in *Zamos v. Stroud* (2004) 32 Cal.4th 958, 966-967, *Zucchet* relied on the Restatement of Torts to define the elements of malicious prosecution.  (*Zucchet*, *supra*, 229 Cal.App.4th at pp. 1483-1485.)  Malicious prosecution includes participating in an investigation or testifying in court " 'after learning that there is no probable cause for believing the accused guilty.  It is not enough that he appears as a witness against the accused either under subpoena or voluntarily, and thereby aids in the prosecution of the charges which he knows to be groundless.  His share in continuing the prosecution must be active, as by *insisting upon or urging* further prosecution.' " (*Id*. at p. 1483, quoting Rest.2d Torts, § 655, com. c, p. 414, italics added.)

There is no evidence here that MacDonald "sought out the

police or prosecutorial authorities" (*Sullivan*, *supra*, 12 Cal.3d at p. 720) or "instigate[d]" the prosecution (*Cedars-Sinai*, *supra*, 206 Cal.App.3d at p. 417). Stradley declared the opposite: MacDonald never advocated for Orcutt's arrest or prosecution. MacDonald was not one of the persons who complained to police. He answered questions for police only after the investigation had progressed, and after Orcutt was identified as the lone suspect. MacDonald asked police to seek other witnesses to establish authorship of the cards, and refused to further participate in the investigation. His telephone call to police the day after he was interviewed repeated the information he previously provided in response to the police investigation. MacDonald testified at the preliminary hearing reluctantly under compulsion of a subpoena. Orcutt did not establish a prima facie case that MacDonald initiated the prosecution.

Nor is there evidence that MacDonald "*falsely* reported *facts*" to police. (*Sullivan*, *supra*, 12 Cal.3d at p. 720, italics added.) Instead, MacDonald provided an *opinion* based on his observations. This case is similar to *Cedars-Sinai*, where witnesses' identification of the voice in a telephoned bomb threat was a basis to arrest and prosecute the person they identified. (*Cedars-Sinai*, *supra*, 206 Cal.App.3d at p. 416.) Although the criminal charges there were later dismissed, the witnesses were entitled to summary judgment for malicious prosecution. (*Id*. at p. 417.)

MacDonald told police he had seen Orcutt's handwriting some 30 times; the passage of several years and the fact they did not always work the same shifts at the same station did not show that MacDonald knew his statements were false. MacDonald did not claim to be a handwriting expert, and he was not required to be. Even at trial, "[a] witness who is not otherwise qualified to

9

testify as an expert may state his opinion whether a writing is in the handwriting of a supposed writer if the court finds that he has personal knowledge of the handwriting of the supposed writer." (Evid. Code, § 1416.)

The cases cited by Orcutt are inapposite. In *Rupp v. Summerfield* (1958) 161 Cal.App.2d 657, Summerfield reported to police that his watch had been stolen, which resulted in Rupp's arrest and prosecution. But the jury found the report to police was false because Summerfield had given Rupp the watch. *Rupp* affirmed the judgment for malicious prosecution because "the defendant was not merely a witness at the preliminary hearing but initiated the proceeding by knowingly making a false report to law enforcement officers and that he intentionally and knowingly testified falsely at the preliminary hearing." (*Rupp*, at p. 663.) But MacDonald was interviewed by police in an investigation initiated by complaints from others and Pelletier's recollection of receiving similar communications from Orcutt. There is no evidence MacDonald knowingly made false statements.

In *Williams v. Hartford Ins. Co.* (1983) 147 Cal.App.3d 893, the complaint alleged malicious prosecution based on a conspiracy to make false statements to police and the court. (*Id.* at pp. 895, 897.) The court held the demurrer should have been overruled because a demurrer challenges only the legal sufficiency of the complaint and not the plaintiff's ability to prove the allegations. (*Picton v. Anderson Union High School Dist.* (1996) 50 Cal.App.4th 726, 732.) In contrast, an anti-SLAPP motion requires the plaintiff produce admissible evidence to support the allegations in the complaint. (*Lee v. Kim, supra*, 41 Cal.App.5th at p. 721.) Orcutt failed to do so. *Williams* recognized that "in most cases, a person who merely alerts law

10

enforcement to a possible crime and a possible criminal is not liable if, law enforcement, on its own, after an independent investigation, decides to prosecute." (*Williams*, at p. 898.) That is what happened here.

### *Probable cause*

The probable cause element requires determination of " 'whether, on the basis of the facts known to the defendant,' " "it was objectively reasonable for the defendant . . . to suspect the plaintiff . . . had committed a crime." (*Ecker v. Raging Waters Group, Inc.* (2001) 87 Cal.App.4th 1320, 1330.) "That question can be answered only on the basis of what the accuser knew or should have known when initiating proceedings. . . . Evidence that appears later, and could not reasonably have been known to the accuser, does not discredit an action taken earlier." (Rest.3d Torts, Liability for Economic Harm, § 22, com. b, p. 188.) Here, there is no evidence that MacDonald knew about the FBI handwriting analysis or other subsequent investigation before he talked to police or testified.

We view the element of lack of probable cause in light of MacDonald's limited role as a witness in an ongoing investigation. "Public policy requires that 'private persons who aid in the enforcement of the law should be given an effective protection against the prejudice which is likely to arise from the termination of the prosecution in favor of the accused.' " (*Cedars-Sinai*, *supra*, 206 Cal.App.3d at p. 418.) This policy would be inconsistent with a requirement that witnesses who merely provide information regarding some aspect of an investigation must first satisfy themselves that there is probable cause the defendant committed a crime. (3 Dobbs et al., The Law of Torts (2d ed. 2011) § 588, p. 394 [suggesting citizen "need only state the facts accurately" and need not believe the accused committed the

offense].)

Orcutt contends that lack of probable cause is established by several "inconsistencies" in MacDonald's statements. But the failure of MacDonald's declaration to mention the June 29 or New York phone calls are not inconsistencies. The declaration was only one and a half pages long and did not claim to cover every aspect of the criminal investigation. His declaration conflicted with his preliminary examination testimony as to whether Stradley was among the officers who showed him the cards, but that detail is not significant and is not a conflict in " 'evidence bearing on the question of probable cause.' " (*Greene v. Bank of America* (2013) 216 Cal.App.4th 454, 465.) Orcutt has not established that MacDonald acted without probable cause.

*Malice*

Finally, there is no evidence of malice or an improper purpose. A mere conflict between MacDonald's opinion and other evidence does not show malice. (*Cedars-Sinai*, *supra*, 206 Cal.App.3d at p. 417, fn. 2.) "Merely because the prior action lacked legal tenability, as measured objectively . . . , *without more*, would not logically or reasonably permit the inference that such lack of probable cause was accompanied by the actor's subjective malicious state of mind. In other words, the presence of malice must be established by other, additional evidence." (*Downey Venture v. LMI Ins. Co.* (1998) 66 Cal.App.4th 478, 498-499, fn. omitted.) There was no evidence that MacDonald believed probable cause was lacking when he provided his statements and testimony. His statement that he was "not fond of" Orcutt, based on a previous incident in a fire station, or the purported inconsistencies in his statements discussed above, are not evidence that he reported his opinion to police or at the preliminary hearing for an improper reason.

12

*Conclusion*

Because Orcutt has not established a probability he would succeed on his malicious prosecution claim, the court properly granted the section 425.16 motion. MacDonald as the prevailing defendant is entitled to costs and attorney's fees on appeal pursuant to a noticed motion in the trial court. (§ 425.16, subd. (c)(1); Cal. Rules of Court, rules 8.278, 3.1702(c); *Wanland v. Law Offices of Mastagni, Holstedt & Chiurazzi* (2006) 141 Cal.App.4th 15, 21.)

## DISPOSITION

The judgment is affirmed. Respondent shall recover costs and attorney's fees on appeal, in an amount to be determined on noticed motion in the trial court.

NOT TO BE PUBLISHED.

BALTODANO, J.

We concur:

GILBERT, P. J.

YEGAN, J.

13

Rita Coyne Federman, Judge

Superior Court County of San Luis Obispo

_____

Decker Law and James D. Decker for Plaintiff and Appellant.

Adamski Moroski Madden Cumberland & Green, Joshua M. George, Chase W. Martin; Greines, Martin, Stein & Richland, Timothy T. Coates and Jeffrey E. Raskin for Defendant and Respondent.